UNITED STATES of America, Plaintiff,

v.

Nelson JOE, Defendant.

No. CR 90–533 JC.

United States District Court,
D. New Mexico.

July 18, 1991.

Mary L. Higgins, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff.

Theresa E. Storch, Asst. Federal Public Defender, Albuquerque, N.M., for defendant.

## MEMORANDUM OPINION

CONWAY, District Judge.

BY ITS Order of June 19, 1991, this Court denied the defendant's Motion to Suppress Statement. An evidentiary hearing in this matter was held on May 1, 1991, at which time the Court ordered the parties to submit supplementary briefs on the issue of whether the interrogation of the defendant was custodial for the purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, the Court directed the parties to discuss whether the Court should apply a refined reasonable man standard in determining whether or not the defendant objectively believed he was in custody at the time of the interrogation. In its Order denying the motion to suppress the Court indicated that a memorandum opinion setting forth the reasoning for the Court's determination of the custodial question would be forthcoming. The purpose of this Memorandum Opinion is to fully explicate the Court's reasoning on this novel issue.

### I.

The defendant, a Navajo Indian, was charged[1] with aggravated sexual abuse. On June 25, 1990 Special Agent Stanley B. Burke of the Federal Bureau of Investigation visited Mr. Joe at his residence in Cousins, New Mexico to interview the defendant about allegations that he had sexually abused an Indian juvenile. During the course of the interview, Mr. Joe made various inculpatory statement which he then sought to suppress.

The testimony at the hearing on the motion to suppress established the following. Special Agent Burke travelled alone to the defendant's residence and, upon arriving, asked and received permission to talk with Mr. Joe in Mr. Joe's hogan. Although other individuals were present when Special Agent Burke arrived, Special Agent Burke and Mr. Joe were alone during the interview. Before commencing the interview Special Agent Burke informed the defendant that he was not under arrest and advised him of his constitutional rights against self-incrimination. While advising Mr. Joe of these rights, Special Agent Burke ascertained that the defendant's knowledge of the English language was sufficiently limited to warrant taking extra precautions to ensure that Mr. Joe understood the nature of his rights. Agent Burke therefore carefully explained each of the rights set forth in the so-called *Miranda* warnings and asked the defendant to explain in his own words what he understood those rights to mean. Once he was satisfied that the defendant understood both his rights and the words used to express those rights, Special Agent Burke asked the defendant if he would be willing to waive these rights. The defendant assented and Special Agent Burke commenced the interview leading to the inculpatory statements. At no time during or immediately after the interview was the defendant placed under arrest.

### II.

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court stated that in the absence of a formal arrest, whether the defendant was in custody at the time of questioning is determined by asking "how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3151. The defendant contends that the June 25, 1990 interview conducted by

---

1. The defendant entered a plea of guilty to the reduced charge of abusive sexual contact on June 21, 1991.

Special Agent Burke constituted a custodial interrogation, that Mr. Joe did not make a "knowing, voluntary and intelligent" waiver of his Fifth Amendment rights, and that therefore any inculpatory statements made during the course of the interview must be suppressed. The Court need not reach the waiver issue unless it first determines that the interview constituted a custodial interrogation.

Mr. Joe is a Navajo Indian and, according to his testimony, is unfamiliar with the concepts underlying the Fifth Amendment, in particular, and the American criminal justice system, in general. Furthermore, testimony at the motion to suppress established that Mr. Joe's intellectual abilities are significantly below average. Finally, Mr. Joe's knowledge of the English language is limited and rudimentary. The defendant argues that *Berkemer*'s "reasonable man" standard should be modified to account for these characteristics. Thus, the defendant contends, the Court should consider whether a reasonable man who 1.) is a Navajo Indian wholly unfamiliar with the procedures and concepts of the American criminal justice system, 2.) has less than average intelligence, and 3.) has only a limited knowledge of the English language, would have objectively believed that he was in custody at the time of his interview with Special Agent Burke. After considering the parties' supplemental briefs and reviewing the applicable law, the Court has determined that it would be inappropriate to adopt such a refined reasonable man standard.

The Tenth Circuit has had no occasion to consider whether there are any circumstances under which it would be appropriate to apply a refined reasonable man standard under *Berkemer*. The resolution of this issue must be informed and guided by the Supreme Court's adoption in *Berkemer* of the following rationale supporting an objective test: "an objective, reasonable-man test is appropriate because, unlike a subjective test, it ... 'does [not] place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" *Berkemer v. McCarty, supra,* 468 U.S. at 442, n. 35, 104

S.Ct. at 3151, n. 35 (*quoting People v. P.,* 21 N.Y.2d 1, 9–10, 286 N.Y.S.2d 225, 232–33, 233 N.E.2d 255, 260 (1967)). Two Tenth Circuit cases, though not directly on point, provide insight into the appropriate method of analysis. In addition, two Ninth Circuit cases more directly confront the issue now before the Court.

In *U.S. v. Recalde,* 761 F.2d 1448 (10th Cir.1985), the Tenth Circuit indicated that a defendant's cultural background can be relevant to the issue of whether a defendant is "seized" within the meaning of the Fourth Amendment—a question which, though different, nevertheless corresponds closely to the issue now presented in this case. In *Recalde,* a police officer stopped the defendant's automobile to issue a speeding ticket. The Court ruled, however, that the legitimate stop was transformed into an illegal seizure when the defendant agreed to accompany the officer to the police station. The court emphasized that the officer had retained possession of the defendant's license and automobile registration and had failed to give the defendant his copy of the speeding ticket. The court noted finally that the defendant was a resident alien and that "[h]e gave undisputed testimony that his upbringing and experiences in Argentina had instilled in him an acquiescence to police authority. This factor is certainly relevant to the issue of coercion." *Id.* at 1454. The Tenth Circuit therefore suppressed the narcotics removed from the defendant's car after a search at the police station.

The Tenth Circuit refused to suppress statements made by a Pueblo Indian accused of murder in *U.S. v. Chalan,* 812 F.2d 1302 (10th Cir.1987). The statements were made at an interview in the Pueblo Governor's office on the reservation. The defendant argued that his presence at the interview had been compelled because, according to tribal custom, he could not refuse the Governor's request to attend the interview, and could not leave until dismissed by the Governor. The Court wrote that:

Evidence presented by Chalan at the suppression hearing suggested that obedi-

ence to the Governor is expected of all tribal members. Thus, a tribal member would be expected to appear when summoned by the Governor and to answer any questions asked by the Governor. Although the Governor's actions and status may have influenced Chalan to attend the interview, we are not convinced that this influence sufficiently restrained Chalan's freedom so as to necessitate the safeguards required by *Miranda.* We agree with the trial court that Chalan's desire not to show disrespect toward the Governor does not render the questioning custodial.

*Id.* at 1307. Although on its face this language appears to indicate the Circuit's willingness to apply a refined reasonable man standard to situations like that now before this Court, the ruling in fact supports an inference that cultural factors should be irrelevant to resolution of this issue. In spite of the fact that the Court in *Chalan* specifically found that a "reasonable Pueblo Indian" would not have felt free to leave the Governor's office, the Court determined that the defendant was not in custody when he made the statements he sought to suppress. Thus the Court implicitly rejected modification of the reasonable man standard to account for the defendant's cultural heritage.

The defendant in *U.S. v. Beraun–Panez,* 812 F.2d 578, *modified,* 830 F.2d 127 (9th Cir.1987), was questioned by two police officers about a range fire they were investigating. The interview took place on a remote cattle range in Idaho. Prior to being Mirandized, and in response to statements that his failure to cooperate could lead to deportation and separation from his family, the defendant made inculpatory statements which the Ninth Circuit suppressed. The Court ruled that in determining whether the defendant reasonably believed that he was in custody, it was appropriate to use a refined reasonable man standard and to take into account the fact that the defendant was a resident alien. However, in this case the Court emphasized that the police officers knew that the defendant was an alien and had deliberately exploited that

knowledge in their interview of the defendant. *See id.* at 588.

Finally, in *U.S. v. Moreno,* 742 F.2d 532 (9th Cir.1984), the Ninth Circuit suppressed cocaine discovered during what the Court determined was an airport "detention" of a Colombian citizen whose primary language was Spanish. In making its determination that the defendant had been "seized" within the meaning of the Fourth Amendment, the Court noted that the defendant's "lack of familiarity with police procedures in this country, his alienage and his limited ability to speak and understand the English language contributed significantly to the quantum of coercion present at the DEA office." *Id.* at 536. However, in a concurring opinion, Judge Wallace wrote that "the majority's excursions into a subjective evaluation of Moreno's 'lack of familiarity with police procedures in this country, his alienage and his limited ability to speak and understand the English language' improperly confuses the objective reasonable man test." *Id.* at 537 (Wallace, J., concurring). Judge Wallace continued:

> The subjective matter of familiarity with United States police procedures, presumably a result of alienage in the majority's eyes, has no place in a reasonable man test. An inability to speak and understand English may. Certainly the DEA agent in this case could quickly tell that Moreno had difficulty with English and understood Spanish as a native tongue. Including obvious language barriers as a quality of a hypothetical reasonable man would not burden the police or make unnecessarily subjective the application of a reasonable man test. In this case, a reasonable man in Moreno's situation may therefore mean one who does not have an adequate ability to speak or understand English. I cannot, agree, however, with the majority's dictum on alienage and knowledge of police procedures.

*Id.* at 537–38.

■ Certain conclusions can be drawn from these cases. First, courts must be—and are—extremely reluctant to modify the *Berkemer* objective standard. As far as this Court has been able to determine, only

one court has ever explicitly approved modification of the reasonable man standard, and then only when the evidence indicated that the police both knew of the particular characteristic in question before interviewing the defendant and deliberately exploited that knowledge in the course of the interrogation. Second, if modification is ever warranted, it is warranted only in those situations in which the interviewing officer has actual knowledge of the characteristic at issue.

■ Applying the lessons of this case law in light of the Supreme Court's command that the police must not be forced to "anticipat[e] the frailties or idiosyncracies of every person whom they question," *Berkemer v. McCarty, supra,* 468 U.S. at 442 n. 35, 104 S.Ct. at 3151 n. 35, this Court concludes that it would be inappropriate to utilize a refined reasonable man standard that accounts for either intellectual ability or cultural heritage. The Tenth Circuit has implicitly rejected modification based on cultural heritage. *See U.S. v. Chalan, supra,* 812 F.2d at 1307.[2] To modify the reasonable man standard based on cultural heritage would place upon the police the burden of determining, first, every suspect's cultural heritage *and second,* the

relevance of that heritage to the suspect's perception of the nature of the interview. This Court does not believe that such a burden is warranted or appropriate under *Berkemer.* Although apparently no court has addressed whether the reasonable man standard should be modified to reflect the defendant's intellectual abilities, this Court rejects a modification based on this characteristic as unworkable for substantially the same reasons. An interviewing officer cannot reasonably be expected to determine in the course of an interview either a suspect's specific intellectual skill or the effect of less than average intelligence on the suspect's perception of the situation in which he finds himself. Diminished intellectual ability and cultural heritage are precisely the kinds of "frailties and idiosyncracies" about which the Supreme Court expressed concern in *Berkemer.*

■ The closest issue presented by the defendant's motion is whether the reasonable man standard should be refined to account for the defendant's knowledge of the English language. In the most egregious of situations, when a suspect's knowledge of English is *clearly inadequate,* it *may* be appropriate to refine the standard to account for this characteristic.[3]

**2.** Although the Tenth Circuit in *U.S. v. Recalde, supra,* 761 F.2d at 1448, indicated that cultural heritage can be relevant to the issue of coercion, *id.* at 1454, the Court notes the following distinguishing factors about *Recalde.* First, that case involved questions under the Fourth Amendment, specifically, whether the defendant had in fact voluntarily consented to accompany the police to the police station. The defendant's cultural heritage was only one "relevant factor" among many indicating that he had, in fact, been coerced into accompanying the police officers. Second, *Recalde* did not, like *Chalan,* directly confront whether or not cultural heritage should be used to modify an objective standard. Instead, cultural heritage was merely approved as one relevant factor under consideration by the Court. Cultural heritage may be a factor in determining a suspect's *subjective* belief. However, having determined the suspect's subjective belief, the Court must then determine whether or not that belief is objectively reasonable. The *Recalde* dicta does not reach this determination. Finally, *Recalde* was decided two years earlier than *Chalan.* To the extent that the two cases are inconsistent, this Court believes that *Chalan* is more consistent with the concerns stated by the Supreme Court in *Berkemer.*

**3.** Under such circumstances the interviewing officer is likely to realize almost immediately the extent of the suspect's language abilities, and it might not be unreasonable for the interviewing officer to respond to any obvious deficiencies. But the question of language ability, as it relates to the issue of custody, is far different from that question as it relates to a suspect's ability to make a "knowing, voluntary and intelligent" waiver of his constitutional rights. In the latter situation the suspect's language abilities must be sufficiently developed to allow him to grasp relatively complex ideas and reach a reasoned decision reflecting his understanding of his situation. In some circumstances, a suspect whose knowledge of English is at best rudimentary may not be able to make an "intelligent" waiver unless the rights he is waiving are explained to him in his native language. However, the impact of language deficiencies on a suspect's perception of the nature of an interview is more attenuated. It is not clear that a suspect whose knowledge of English is such that he is capable of conducting a straightforward interview about factual issues but incapable of understanding complex ideas necessarily perceives the custodial or non-custodial nature of the interview dif-

This is not such a case, however. Special Agent Burke testified that he conducted his entire interview in English. He indicated that he was sufficiently aware of and concerned about the defendant's knowledge of English to take special precautions. Nevertheless, the defendant was able to participate and communicate with Special Agent Burke during the course of the interview. The evidence indicates that, while the defendant is not fluent in English, neither is he incapable of expressing himself and understanding simple ideas and concrete factual inquiries. Under these circumstances the Court believes that modification of the reasonable man standard is not warranted.

### III.

■ To determine whether an individual is in custody for purposes of *Miranda*, courts must consider the totality of the circumstances. *See California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). The interview in this matter took place at the defendant's residence and with the defendant's permission. At no time during or immediately after the interview was the defendant placed under arrest. Special Agent Burke was the only police officer present during the interview. The defendant was informed that he was not under arrest before Special Agent Burke commenced questioning the suspect. There is no evidence that Special Agent Burke restrained the defendant in any way. A reasonable person in the position of the defendant would have had no reason to believe that he was in custody at the time of the interview.

■ Mr. Joe also contended that his confession to Special Agent Burke was not voluntary. Courts assess the voluntariness of confessions by examining the totality of the circumstances to determine whether law enforcement officials have overborne the will of the defendant. *See Haynes v.*

ferently than does a native English speaker. It is precisely because of the difficulty in analyzing such factors that the Supreme Court has

*Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). Coercive police activity is a necessary predicate to the finding that a confession is not voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 169–70, 107 S.Ct. 515, 523–24, 93 L.Ed.2d 473 (1986). There is no evidence that Special Agent Burke coerced the defendant in any way. Indeed, testimony directed to the issue of coercion indicated just the opposite. Special Agent Burke testified that he assented to the defendant's express wishes when the defendant refused to allow Special Agent Burke to photograph his hogan. The Court finds that the statement was freely and voluntarily made.

emphasized that whether or not a suspect is in custody should be determined on the basis of demonstrable objective factors.