**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Jorge ZAPATA, Defendant–Appellee.**

No. 92–2183.

United States Court of Appeals, Tenth Circuit.

June 23, 1993.

Sidney M. Glazer, Atty., U.S. Dept. of Justice, Washington, DC (Don J. Svet, U.S. Atty., and Tara Neda, Asst. U.S. Atty., D. of N.M., Albuquerque, NM, with him on the brief), for plaintiff-appellant.

Joseph W. Gandert, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellee.

Before ANDERSON, HOLLOWAY, and TACHA, Circuit Judges.

STEPHEN E. ANDERSON, Circuit Judge.

The government appeals from an order of the district court suppressing evidence—cocaine—seized pursuant to a search of defendant Jorge Zapata's luggage on a train in Albuquerque, New Mexico, as well as statements made following his arrest. Because we hold that the encounter between the officers and Mr. Zapata was consensual, and did not constitute a seizure in violation of the Fourth Amendment, and because we hold that Mr. Zapata voluntarily consented to the search of his luggage, we reverse the district court's grant of the motion to suppress.

## BACKGROUND

Certain basic facts are undisputed. Drug Enforcement Administration Special Agent Kevin Small, dressed in civilian clothes, boarded an Amtrak train on May 27, 1992, while the train was stopped briefly in Albuquerque, en route from Los Angeles to Chicago. Accompanied by Albuquerque Police Department Detective Sam Candelaria, who was under assignment to the Drug Enforcement Administration Task Force, Agent Small walked through the coach section of the train where Mr. Zapata was sitting with his common-law wife, Brenda Contreras, and their young son. Agent Small testified at the suppression hearing that there were approximately 45 to 55 people in the coach car at the time. The agent further testified that he decided to question Mr. Zapata because he observed two new duffle bags in the rack above Mr. Zapata's seat and "of all the drug cases we've done on board the train ...

about 75 percent of them have used new luggage." R.Vol. II at 11.

While Detective Candelaria "stood back against one of the windows watching the platform area," Agent Small turned on a tape recorder in a small fanny pack he wore around his waist and approached Mr. Zapata from behind. *Id.* Agent Small showed Mr. Zapata his DEA badge, and proceeded to ask him a series of questions.[1] The agent stated that he knelt down in the aisle next to Mr. Zapata's seat while he questioned him, and that his gun remained inside his fanny pack and was not visible. Mr. Zapata testified that Agent Small "was standing in front of me" throughout the entire questioning. R.Vol. II at 41. When the agent asked Mr. Zapata if he could search his bags, Mr. Zapata stood up, got the bags down and opened them for Agent Small. Inside the bags Agent Small found several kilograms of cocaine.

The district court found that Agent Small "block[ed] [Mr. Zapata's] egress from the seat" while he asked him questions which "were rapid-fire, direct, accusatory and potentially incriminating." Order at 1–2, R.Vol. I tab 16. The district court also found, and no one disputes this finding, that Mr. Zapata was never told that he could refuse to answer Agent Small's questions or that he could otherwise refuse to comply with the agent's requests. The district court further found that Mr. Zapata was "born and raised in Mexico, and is a Mexican citizen. He had about 11 years of education in Mexico. He has resided in the United States for 3 to 4 years, and is able to communicate in English to a certain degree. However, he speaks with a heavy accent, and his understanding

---

1. The transcript of the recorded conversation between Agent Small and Mr. Zapata reveals the following interchange:

S/A Small: How you doing today? I'm with the police department, can I talk to you for a second?
ZAPATA: Sure.
S/A Small: Where are you headed today?
ZAPATA: Chicago.
S/A Small: And where did you get on the train at?
ZAPATA: Los Angeles.
S/A Small: Los Angeles?
ZAPATA: Uh-huh.
S/A Small: Do you have your ticket with you?
S/A Small: ZAPATA?
ZAPATA: (Cough) Yeah.
S/A Small: Do you have anything with a picture I.D. on it at all Mr. Zapata?
S/A Small: Do you live in Illinois or live in Los Angeles?
ZAPATA: Illinois.
S/A Small: Illinois? How long have you lived there?
ZAPATA: (Cough) For about two (2) years. Longer than that.
S/A Small: Two (2) years?
S/A Small: How long were you out in Los Angeles?
ZAPATA: Uh, three (3) weeks.
S/A Small: Three (3) weeks?
ZAPATA: Yeah.
S/A Small: Do you have any luggage with you today?
ZAPATA: Yes, I do.
S/A Small: Where is it? Do you know?
ZAPATA: Downstairs.
S/A Small: Downstairs? Do you have any other luggage with you?
ZAPATA: Yeah, up there.

S/A Small: I work for the Drug Enforcement Administration, okay. We have a problem onboard the train with people traveling out of Los Angeles, back to Illinois carrying drugs. You don't have any drugs in your luggage do you?
ZAPATA: No, I don't.
S/A Small: Would you voluntarily consent for me to search?
ZAPATA: Sure.
S/A Small: Would that be all right?
ZAPATA: Yeah.
S/A Small: Ma'am, do you speak English?
Brenda CONTRERAS: Yes.
S/A Small: Are one of these your bags?
Brenda CONTRERAS: No.
S/A Small: Would you voluntarily consent for me to search this bag?
S/A Small: Hi there. How old is he?
ZAPATA: Oh, a year and a half.
S/A Small: Year and a half, that's about what mine is.
S/A Small: Sam.
S/A Small: Why don't you put your hands behind your back, all right?
S/A Small: Ma'am are you a citizen of the United States?
CONTRERAS: Yes.
S/A Small: Do you have your immigration papers with you? Uh huh. She's going with us anyway, Sam. She doesn't have her immigration papers?
S/A Small: About three (3) more in here.
S/A Small: Sir, do you have your immigration papers?
Addendum for the United States.

and command of the English language are somewhat deficient." *Id.* at 2–3.

Mr. Zapata testified at the suppression hearing that he got "scared" and "very nervous" when Agent Small identified himself as a police officer. R.Vol. II at 40. He testified that he was scared and nervous because he "knew what was in the bags." *Id.* When asked why he agreed to talk to the agent, Mr. Zapata testified, "I didn't know that I didn't have to talk to him and I thought I had to do it." *Id.*[2] When asked if he felt "that [he] could just leave" while Agent Small was questioning him, Mr. Zapata testified that he did not "[b]ecause I didn't want to leave my family there and I saw the two individuals there, one in front and one in the back." *Id.* at 41.

Mr. Zapata was indicted for possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). He filed a motion to suppress all evidence seized pursuant to the search of his bags as well as all statements made following his arrest, on the grounds that "[t]he initial encounter between Jorge Zapata and Agent Small was an involuntary and nonconsensual seizure" in violation of the Fourth Amendment. Motion to Suppress at 4, R.Vol. I tab 6.

The district court held an evidentiary hearing at which Agent Small and Mr. Zapata testified, and the court listened to the tape recording of the encounter between the two. It granted Mr. Zapata's motion to suppress, finding as follows:

10. Because of his upbringing in Mexico, Defendant believed that he must acquiesce to all police requests because failure to do so could result in dire consequences, including physical harm.

11. A reasonable person in these circumstances with Defendant's background would not have felt free to ignore Agent Small's presence, to decline Agent Small's requests, or to otherwise terminate the encounter and go about his business. When Agent Small began to question Defendant, the Defendant reasonably believed that he was not free to leave or to refuse to answer questions. Defendant reasonably believed he was required to produce his ticket and identification and to allow the agent to search his luggage.

12. Under the circumstances of this case, Defendant reasonably felt intimidated by the presence of the officers, and reasonably interpreted Agent Small's "requests" as commands or demands.

13. The government has not proven that Defendant's consent to the police questioning and search was given freely and voluntarily. The questioning of Defendant was not a voluntary, consensual encounter.

14. Defendant was seized for purposes of the Fourth Amendment when Agent Small began asking Defendant questions. Agent Small lacked reasonable articulable suspicion that Defendant had been, was, or was about to be engaged in criminal activity to justify this seizure. The subsequent search and statements made by Defendant were fruits of the initial illegal detention.

Order at 3–4, R.Vol. I tab 16. The government appeals that order, arguing that the district court erred in concluding that Mr. Zapata was seized in violation of the Fourth Amendment and that the subsequent search and statements must be suppressed.

---

**2.** Mr. Zapata also testified as follows:
Q Why did you allow Mr. Small to search your luggage?
A Because I saw that he was a police officer.
Q And of what significance was the fact he was a police officer?
A I didn't know because I thought that when a policeman asks you something one has to answer.
Q Did you think that when he was asking you, that he was really telling you what to do?

A Yes, sir.
Q Did you believe that you had any choice in not doing what he said?
A At the moment I thought that if I didn't do it he would get angry or he would do something else.
R.Vol. II at 42. When questioned by the court, Mr. Zapata indicated that he had heard that Mexican police "strike you, they hit you" when a citizen encounters a policeman. *Id.* at 47–48.

## DISCUSSION

When we review an order granting a motion to suppress, "we accept the trial court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to the district court's finding." *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir.1993) (citing *United States v. Waupekenay*, 973 F.2d 1533, 1535 (10th Cir.1992) and *United States v. Preciado*, 966 F.2d 596, 597 (10th Cir.1992)). "[T]he ultimate determination of Fourth Amendment reasonableness is a conclusion of law which we review de novo." *United States v. Allen*, 986 F.2d 1354, 1356 (10th Cir.1993); *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir.1992) ("the ultimate determination of the reasonableness of any search or seizure is a question of law reviewed *de novo* by this court"); *United States v. Bloom*, 975 F.2d 1447, 1450 (10th Cir.1992) (" 'the ultimate issue of whether a seizure occurred is a question of law.' ") (quoting *United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir.1992)). "If the district court's factual findings are based on an erroneous interpretation of law, a remand is appropriate unless the record is such that only one resolution of the factual issue is possible." *United States v. Nicholson*, 983 F.2d 983, 987 (10th Cir.1993).

We turn first to the question of whether the encounter on the Amtrak train between Agent Small and Mr. Zapata was a purely consensual encounter or an investigative detention implicating the Fourth Amendment.

### I. *Seizure or Consensual Encounter*

■ "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). " '[O]nly when the officer, by means of physical force or show of authority, ... in some way restrain[s] the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16,

88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)); *see also Laboy*, 979 F.2d at 798. Thus, police may freely ask questions of any individual they choose, including requesting to see identification and requesting consent to search the individual's luggage, "so long as the officers do not convey a message that compliance with their requests is required." *Bostick*, —— U.S. at ——, 111 S.Ct. at 2388; *see also Bloom*, 975 F.2d at 1451–52.

■ The Supreme Court in *Bostick* articulated the test to be applied to any police encounter, whether occurring on "trains, planes, [or] city streets":

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Bostick*, —— U.S. at —— - ——, 111 S.Ct. at 2388–89.[3] Applying that "free to decline officers' requests or otherwise terminate the encounter" test to the facts of this case, we hold that no seizure occurred when Agent Small questioned Mr. Zapata.

■ We consider a number of factors in determining whether a police-citizen encounter becomes a seizure: the location of the encounter, particularly whether the defendant is "in an open public place where he [is] within the view of persons other than law enforcement officers," *Ward*, 961 F.2d at 1531; whether the officers "touch or physically restrain" the defendant, *id.* at 1533; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically

---

3. Of course, the nature of the police-citizen encounter can change—what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa. *See Bloom*, 975 F.2d at 1455–56 (consensual encounter became investigative detention

when police questioning changed); *United States v. Werking*, 915 F.2d 1404, 1409–10 (10th Cir. 1990) (investigative detention ended and encounter became consensual when police returned defendant's license and papers).

"advised defendant at any time that he had the right to terminate the encounter or refuse consent." *Id.*[4] *See also Bloom*, 975 F.2d at 1453–54; *Laboy*, 979 F.2d at 799.

■ Virtually all those factors indicate a consensual encounter between Agent Small and Mr. Zapata. First, the encounter occurred in a public setting, in a coach car of the train, in view of dozens of other travelers. When confronted by authorities in such a public place, a reasonable person is less likely to feel that he is unable to decline the agent's request or otherwise terminate the encounter. *See Ward*, 961 F.2d at 1532 ("in a public setting ... the reasonable innocent person is less likely to feel singled out as the officers' specific target—and less likely to feel unable to decline the officers' requests and terminate the encounter."); *see also United States v. Ray*, 973 F.2d 840, 842–43 (10th Cir.1992) ("A decisive factor in *Ward* was the defendant was not in a public place or in view of persons other than law enforcement personnel.").

Furthermore, neither Agent Small nor Detective Candelaria touched or physically restrained Mr. Zapata in any way; the agents were in plain clothes and did not brandish or display their weapons; and the officers used a regular tone of voice in asking a series of essentially routine questions. *See Ward*, 961 F.2d at 1533. Similarly, Mr. Zapata's ticket and identification were retained only briefly by Agent Small and promptly returned to Mr. Zapata after they had been examined. *Cf. United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993) (encounter not consensual "[u]nless the officer has returned the driver's documentation.").

■ While Mr. Zapata was never informed by Agent Small that he need not answer the agent's questions or refuse con-

sent to search his luggage, although he was asked if he would "voluntarily" consent to the search, "this one factor by itself does not determine whether a seizure has occurred." *Ward*, 961 F.2d at 1533. Similarly, the fact that there were two agents involved, which may, in some circumstances, "increase[ ] the coerciveness of an encounter," *Ward*, 961 F.2d at 1533, does not outweigh the multiple other factors indicating a purely consensual encounter.

■ We also specifically hold that the district court erred in considering Mr. Zapata's "background" and "upbringing" in determining whether a seizure occurred. As this court made clear in *Bloom*, and reiterated in *Laboy*, the particular personal traits or subjective state of mind of the defendant may be relevant to some degree to the issue of the voluntariness of that person's consent, but they are irrelevant to the legal question of whether a seizure has occurred by virtue of the police conduct involved. That inquiry is governed by *Bostick*'s "reasonable person" test, which is clearly an objective test: under the totality of the circumstances, would "the police conduct ... have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, — U.S. at —, 111 S.Ct. at 2389. Thus, Mr. Zapata's own subjective attitudes toward the police encounter, or any other of his particular personal attributes, are irrelevant, "other than to the extent that they may have been known to the officer and influenced his conduct." *Bloom*, 975 F.2d at 1455 n. 9. There was no evidence presented that Agent Small was aware of Mr. Zapata's attitude toward police officers or was aware of any details concerning Mr. Zapata's upbringing and background. Nor was there evidence that

---

4. In this connection, Agent Small's request that Mr. Zapata "voluntarily consent" to a search of his luggage would not necessarily constitute the specific statement that Mr. Zapata need not answer the agent's questions or permit a search of his luggage. In *Bloom*, Agent Small also asked for the defendant's "voluntary" consent, yet we specifically noted that an important factor in our conclusion that a seizure had occurred was the lack of an explicit advisement that the defendant need not answer questions or permit a search of his belongings. *See also Bostick*, — U.S. at

—, 111 S.Ct. at 2385; *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (express statement to defendant that she could decline consent was "especially significant"). Of course, such an explicit advisement is not a *requirement;* it is merely a factor to be considered in the totality of the circumstances. *See INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Schneckcloth v. Bustamonte*, 412 U.S. 218, 231, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973); *Laboy*, 979 F.2d at 799; *Bloom*, 975 F.2d at 1454–55; *Ward*, 961 F.2d at 1533.

Mr. Zapata's limited fluency in English influenced Agent Small.[5]

We conclude that, based on the totality of the circumstances, the encounter between Mr. Zapata and Agent Small remained consensual, and did not amount to a seizure in violation of the Fourth Amendment. The encounter occurred in a public setting, in view of dozens of other people, the officers' conduct and demeanor was essentially non-coercive and non-threatening, and Mr. Zapata's ticket and identification were only briefly retained and were promptly returned. A reasonable person in Mr. Zapata's position would have felt free to decline to answer the agent's questions or otherwise terminate the encounter.

## II. Voluntariness of Consent

■ The district court also found, and Mr. Zapata argues on appeal, that Mr. Zapata's consent to the search of his luggage was not freely and voluntarily given. We turn now to that issue.

■ We determine the voluntariness of Mr. Zapata's consent to the search of his luggage under the totality of the circumstances, with the government bearing the burden of proof. *Soto*, 988 F.2d at 1555; *United States v. Nicholson*, 983 F.2d 983, 988 (10th Cir.1993); *United States v. Price*, 925 F.2d 1268, 1271 (10th Cir.1991). "[T]he government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Nicholson*, 983 F.2d at 988.

The district court found that the government had failed to prove that Mr. Zapata's consent was freely and voluntarily given. We "must accept that finding unless it is clearly erroneous." *Id.* We hold that it is clearly erroneous.

Our recent decision in *Soto* is instructive. In finding that the consent given in that case was voluntary, we stated as follows:

[T]here is no evidence that any overt coercion was employed. It appears [the officer] did not unholster his weapon, did not use an insisting tone or manner, did not physically harass defendant, and no other officers were present. Further, the incident occurred on the shoulder of an interstate highway, in public view. [The officer] sought permission specifically to look in the trunk, and the defendant got out of the car and opened the trunk himself. Defendant makes no contention that he misunderstood [the officer's] request; any such claim is precluded by defendant's act of opening the trunk. Thus, defendant's consent was unequivocal and specific.

988 F.2d at 1558.

Similarly, Agent Small in this case used no overt coercion or display of weapons. While the district court found that the agent's questions were "rapid-fire, direct, accusatory and potentially incriminating," the transcript of the interchange between Agent Small and Mr. Zapata suggests fairly routine questioning. And while virtually any question could conceivably be "potentially incriminating," the only directly "potentially incriminating" question Agent Small asked Mr. Zapata (whether Mr. Zapata had any drugs in his luggage) occurred more than half way through the interchange. Moreover, as in *Soto*, the interchange and the giving of the consent occurred in public view in the coach section of the train in the presence of 45 to 55 other people. Additionally, as in *Soto*, Agent Small specifically sought permission to search Mr. Zapata's luggage, and Mr. Zapata makes no argument that, nor is there evidence that, he did not understand the agent's request, which the agent made twice, to search the luggage. "[A]ny such claim is precluded by [Mr. Zapata's] act of opening the [bag]." *Id.* And the transcript reveals that Mr. Zapata said, "Sure" and, "Yeah," when asked whether he would consent to the search. *See United States v. Werking*, 915 F.2d 1404, 1410 (10th Cir.1990) (consent "unequivocal, specific, and freely and intelligent-

---

5. Agent Small testified that he did not immediately notice Mr. Zapata's accent because "[h]e didn't say a whole lot of words for me to pick up an accent. It wasn't until I think he said a couple sentences, you know, a couple words back to back that, I think he said 'up there' or something about the luggage that I picked up an accent." R.Vol. II at 26–27. The agent also testified that he "believed [Mr. Zapata] was from the United States." *Id.* at 27.

ly given" when defendant "answered 'no' when asked whether he minded if [the officer] looked in the trunk and later shook his head 'no' when asked whether he minded if [the officer] looked in the duffel bags."). All of those circumstances would compel the conclusion that Mr. Zapata's consent, like the defendant's in *Soto*, was unequivocal, specific, and freely and intelligently given.

■ The primary factor upon which the district court relied to conclude that Mr. Zapata's consent was not voluntary, and a principal factor Mr. Zapata asserts on appeal, is his background and attitude toward police, derived from his experiences in his native Mexico. As we noted in *Bloom*, while "[a] person's subjective characteristics may be relevant to the voluntariness of the person's consent ... recent Supreme Court decisions cast doubt on this issue." *Bloom*, 975 F.2d at 1455 n. 9.

But even assuming some subjective characteristics are relevant to the validity of Mr. Zapata's consent, we reject the notion that his attitude toward police, from whatever source, can constitute such a relevant subjec-

tive characteristic. While such attributes as the age, gender, education, and intelligence of the accused have been recognized as relevant, *see United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987), an intangible characteristic such as attitude toward authority is inherently unverifiable and unquantifiable.[6] Generalities about attitudes are even more vaporous. The district court's finding that Mr. Zapata's consent was not freely and voluntarily given is clearly erroneous.

For the foregoing reasons, the decision of the district court granting Mr. Zapata's motion to suppress evidence is REVERSED and the case is REMANDED for further proceedings.

HOLLOWAY, Circuit Judge, dissenting:

I respectfully dissent. I disagree with both the majority's view that there was no

---

**6.** In finding in *Ward* that subjective characteristics are relevant to the issue of coercion, we cited *United States v. Recalde*, 761 F.2d 1448, 1454 (10th Cir.1985), in which we stated that the defendant's "undisputed testimony that his upbringing and experiences in Argentina had instilled in him an acquiescence to police authority" was relevant to the issue of coercion. In so stating, *Recalde* cited *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047 and *Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879, both of which addressed the type of characteristics of the accused which are relevant to the validity of a consent. Neither case includes within its consideration of relevant characteristics the kind of subjective attitude toward authority or cultural heritage held to be relevant in *Recalde*. *Cf. United States v. Chalan*, 812 F.2d 1302, 1307–08 (10th Cir.1987) (in evaluating whether statement by Cochiti Indian was voluntary, court considered whether he was specifically told he need not answer questions, length of interview, environment in which interview took place, defendant's experience with law enforcement, and defendant's susceptibility to coercion "because of his age or lack of education or intelligence."), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *United States v. Joe*, 770 F.Supp. 607, 611 (D.N.M.1991) (discussing *Recalde* and the later decision in *Chalan* and observing that "[t]he Tenth Circuit has implicitly rejected modification [of reasonable person test] based on cultural heritage.").

Moreover, even in *Ward*, the "personal traits" held to be relevant were the defendant's "slight physique and health problems"—characteristics more akin to the characteristics considered in *Schneckloth* and *Mendenhall* than the attitude toward authority mentioned in *Recalde*.

In any event, *Recalde* itself gives no indication of the weight to be given the factor of the defendant's attitude toward authority, and the case itself demonstrates that it was only one of many factors leading to the conclusion that the consent was involuntary. *See Joe*, 770 F.Supp. at 611 n. 2. While we would accord that factor no weight, one panel of this court cannot overrule another panel. *See United States v. Spedalieri*, 910 F.2d 707, 710 n. 3 (10th Cir.1990). We are quite confident, however, that *Recalde* does not require that the factor be given controlling or even significant weight, as it was in this case by the district court. *Cf. United States v. Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir.1992) (rejecting argument that defendant's "background and limited ability to speak English prevented him from voluntarily consenting to the search."), *cert. denied*, —— U.S. ——, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993); *see also United States v. Analla*, 975 F.2d 119, 124 (4th Cir.1992) (rejecting argument that a seizure occurred because of defendant's attitude toward police "based on his experience with Moroccan police."), *cert. denied*, —— U.S. ——, 113 S.Ct. 1853, 123 L.Ed.2d 476 (1993).

seizure of Zapata when he was confronted and interrogated, and also with its holding clearly erroneous the trial judge's ultimate finding that Zapata's consent to the search was involuntary. I address first the involuntariness of the consent to search.

The majority opinion makes a thorough and forceful analysis from its perspective. I am unable to agree, however, particularly because I am convinced the significant perspective here was that of the trial judge who heard and saw the witnesses and was charged with the duty of making the critical findings of fact. To me the district court's crucial finding that the "government has not proven that Defendant's consent to the police questioning and search was given freely and voluntarily" cannot be held clearly erroneous on this record. Consent for the search of defendant's luggage not being freely and intelligently given, the evidence from the search and the statement that followed were properly suppressed.

Our recent decision in *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993),[1] makes it clear that

> The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue.... the government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.

Underlying the trial judge's ultimate finding here that the government did not prove that consent for the questioning and search was given freely and voluntarily were specific, historical subsidiary fact findings: Agent Small positioned himself next to defendant's seat, blocking egress; Small identified himself as a police officer, flashed his badge and began asking pointed questions about Zapata's destination and from where he had come; Small requested Zapata's ticket and identification; Small asked whether Zapata had any drugs in his luggage and whether he would "voluntarily consent" to a search. The judge found that "[t]he questions were rapid-fire, direct, accusatory and potentially incriminating," and that "Defendant was not advised of his right to refuse to answer the agent's questions or to refuse to comply with the agent's requests." Order at 2.

The record amply supports these findings by the trial judge. Agent Small and Zapata were the only witnesses at the suppression hearing. Small admitted that when he first asked if he could talk to Zapata, he did not ever tell Zapata he had a right not to talk to Small and that Zapata had the right not to answer the question whether he had any luggage. Tr. at 27, 32. Most pertinently, the tape recording of their initial conversation and the transcript of it, Pl.'s Exs. 2 and 3,[2] show that no statement was made by Agent Small to Zapata advising him that he had the right to refuse consent for the search, unlike the situation in *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2385, 115 L.Ed.2d 389 (1991) (among facts "particularly worth noting" was "[f]irst, the police specifically advised Bostick that he had the right to refuse consent"). We have recently twice stressed the importance of the lack of advice to the defendant of his right to terminate the encounter or to refuse consent. *See United States v. Bloom*, 975 F.2d 1447, 1455 (10th Cir.1992); *United States v. Ward*, 961 F.2d 1526, 1533 (10th Cir.1992). While such an explicit advisement is not a requirement, it is a significant factor to consider in the totality of the circumstances, *see INS v. Delgado*, 466 U.S. 210, 215–16, 104 S.Ct.

---

1. The majority opinion relies heavily on our decision in *Soto*, listing a number of factors present there as indicating voluntariness of consent. *See supra* p. 758. Those factors do lend support to a finding of voluntariness of consent. But we must keep in mind the fact that in *Soto*, we were reviewing a trial court's finding of voluntariness and were noting record evidence supporting the finding. Here we should similarly be giving consideration to the evidence and factors cited by the trial judge supporting his finding of a lack of voluntary consent, as we make our review of the whole record. In my judgment, the evidence and factors cited by the trial judge amply support his finding that the "government has not proven that defendant's consent to the police questioning and search was given freely and voluntarily." Order at 3.

2. Respectively II Supp.R. and I Supp.R.

1758, 1762, 80 L.Ed.2d 247 (1984), as the majority opinion properly notes. *See supra* p. 757 n. 4.

A consent to search is valid if it is voluntarily given and the question whether a search is voluntary is a question of fact to be determined by the district court from the totality of the circumstances. *United States v. Wright,* 932 F.2d 868, 878 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 *and cert. denied sub nom Kirby v. United States,* —— U.S. ——, 112 S.Ct. 450, 116 L.Ed.2d 467 (1991). Such findings of fact may not be disturbed unless clearly erroneous. *Campbell v. United States,* 373 U.S. 487, 493, 83 S.Ct. 1356, 1359, 10 L.Ed.2d 501 (1963) (noting importance of *ad hoc* appraisal by trial judge that "may well have depended upon nuances of testimony and demeanor of witnesses"); *Wright,* 932 F.2d at 878 ("We must accept the court's findings [on voluntariness of consent] unless they are clearly erroneous"). Moreover, as the Supreme Court has instructed us:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Here the trial judge was weighing the testimony and demeanor of Agent Small and Zapata in order to make his findings of subsidiary facts and his ultimate finding that the government had not proven consent for the search was given freely and voluntarily. In my view, the judge's assessment of the evidence bearing on those findings cannot be held clearly erroneous. Ample evidence supporting the trial judge's views is apparent and we must remember that the government bore the burden of proof that Zapata's consent was voluntary. *United States v. Evans,* 937 F.2d 1534, 1538 (10th Cir.1991). Accordingly, we should not disturb the crucial findings made on this issue of consent.[3]

Thus I would uphold the trial judge's finding that the government did not prove that Zapata's consent for the search was free and voluntary. This conclusion alone is an ample premise for affirming the order of suppression. However, I also respectfully disagree with the majority's rejection of the trial court's finding that a seizure of Zapata occurred in these circumstances when Agent Small began questioning Zapata without reasonable articulable suspicion. Order at 3–4.

The majority opinion notes correctly that the question whether a seizure occurred is a question of law. *See supra* p. 756. In reversing the trial court's seizure ruling, the majority relies first on *Florida v. Bostick* and its inquiry whether a reasonable person would have felt that he "was not free to decline the officer's requests or otherwise terminate the encounter." Primarily the majority opinion focuses on the factual similarity to one aspect of *Bostick*—that the encounter occurred in the coach car of the train and in view of some 45–55 other travelers.

*Bostick* itself instructs us that "[w]here the encounter takes place is one factor, but it is not the only one." —— U.S. at ——, 111 S.Ct. at 2387. The Court noted further that no seizure occurs when questioning begins with identification and a request for a search is made—*"so long as the officers do not convey a message that compliance with their*

---

**3.** The majority opinion acknowledges our rule that one panel may not overrule an earlier decision of the court and our consideration in *United States v. Recalde,* 761 F.2d 1448, 1454 (10th Cir.1985), of factors relating to the defendant's upbringing and experiences as an alien. Nevertheless the majority says it would accord Zapata's circumstances and attitude toward authority no weight; but acknowledging *Recalde,* the majority says that our prior precedent does not require such factors to be given controlling or significant weight. I cannot join in the disagreement with *Recalde.* Here, Zapata's language deficit (his testimony was given with the aid of an interpreter) was a part of the objective conditions observed by the trial judge, along with Zapata's demeanor, and I see no reason for the judge's references to Zapata's circumstances to be treated as a basis for reversing the judge's findings.

*requests is required.*" —— U.S. at ——, 111 S.Ct. at 2388 (emphasis added). Here the trial judge carefully focused on those very factors as his findings show: Agent Small positioned himself next to Zapata's seat, blocking egress; he flashed his badge and began pointed questioning;[4] his questions "were rapid-fire, direct, accusatory and potentially incriminating"; no other passengers in the car had been or were being questioned by either officer when defendant was questioned; and defendant was not advised of his right to refuse to comply with the officer's requests, including that for Zapata's consent to a search. Order at 1–2. These underlying findings of historical facts are in the nature of what the parties to the encounter said or did and those findings may not be disturbed unless clearly erroneous. *United States v. Montilla,* 928 F.2d 583, 588 (2d Cir.1991).

In my judgment, the factual circumstances as found by the trial judge furnish a solid basis for his conclusion that a seizure occurred when the accusatory questioning began in this setting. I am persuaded that the judge was carefully considering *Bostick,* as well as *Ward* and *Bloom,* and that his ruling that a seizure occurred, without reasonable articulable suspicion, was not in error. Being convinced that no error was committed by the trial court in his underlying findings or in his conclusion that a seizure occurred without articulable suspicion, I would affirm on this additional ground.

---

4. In *Ward,* 961 F.2d at 1533 n. 6, we noted our agreement with the Sixth Circuit "that a reasonable person 'would not believe that a police offi-cer is not armed.'" *Id.* (citing *United States v. Grant,* 920 F.2d 376, 382 (6th Cir.1990)).