1 F.3d 1250
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Roberto LIZARRAGA-RAMIREZ, Defendant-Appellant.
 No. 92-2070.
 United States Court of Appeals, Tenth Circuit.
 July 22, 1993.
 
 Before MOORE, ANDERSON, and EBEL, Circuit Judges.
 ORDER AND JUDGMENT*
 EBEL, Circuit Judge.
 
 
 1
 In this case, the defendant alleges that he was illegally detained and searched at an Albuquerque train station and that the district court therefore erred in denying his motion to suppress cocaine found in the search. We affirm.
 
 I. FACTS
 
 2
 Samuel Candelaria, a narcotics detective with the Albuquerque Police Department, was working at the Amtrak train station in Albuquerque on August 9, 1991. He observed the defendant-appellant, Roberto Lizarraga-Ramirez ["the defendant"], exit a train and walk quickly away from the train to the depot. The detective followed the defendant into the depot, and watched as he made a phone call. The detective overheard the defendant saying, in Spanish, that he was at the depot and needed to be picked up.
 
 
 3
 The defendant then walked into the men's restroom. The detective followed him, and observed the defendant enter a stall. From the detective's vantage point, it appeared to him that for most of the seven minutes that the defendant was in the stall, he was sitting on the toilet with his carry-on bag in his lap. The detective heard a zipper being opened and a rustling of paper. According to the detective, the defendant did not flush the toilet when he left the stall.
 
 
 4
 After the defendant left the bathroom, the detective followed him to an area outside of the depot that was covered by a canopy, where passengers typically wait for taxis or other vehicles to pick them up. The detective approached the defendant, showed him his badge, told him in English that he was a police officer, and asked if he could speak to him. The defendant took the badge, shook his head as if he did not understand, and indicated that he did not speak English. At the suppression hearing, the detective testified that he then asked the defendant in Spanish, "I'm a policeman from this city, please can I speak to you."[1] The defendant said yes. The detective then asked where the defendant was from, and he responded that he was from Pomona. After ascertaining that the defendant had a train ticket, the detective testified that he then asked "Please can I see it." The defendant handed it to him. The detective noticed that the name on the ticket was Jose Chavez, and that it was a one-way ticket, paid for in cash, from Pomona, California, to Albuquerque, New Mexico.
 
 
 5
 The detective asked what the defendant's name was. The defendant, after leaning over to look at the ticket, said that his name was Roberto and that a friend had given him the ticket. According to the detective, he then returned the ticket to the defendant and asked, "What have you identification?" The defendant offered an Arizona identification card in the name of Roberto Lizarraga-Ramirez. The detective testified that he then returned the identification card to the defendant. He stated that he learned from his training that if an officer asks to see a person's documents at a train station, the officer should briefly inspect them and return them, so that any time the person no longer wishes to speak to the officer, he or she could leave.
 
 
 6
 The detective testified that he next asked the defendant, "Please, what can I see in your luggage, what can I look for drugs in your luggage." He denied the defendant's claim that he used the term "muestrame" or that he even knew what it meant before he read the motion to suppress. "Muestrame" has the connotation of an order, and is used to tell someone to show something or demonstrate something. In response to the detective's request, the defendant said yes, bent down, and unzipped the small carry-on bag that he had with him. He then began moving the clothing in and around the bag and appeared to be pushing it to one side. The detective testified that he could see a paper bag inside the carry-on. The detective bent down and turned the bag on its side. According to the detective, because the paper bag was open at the top rather than folded over, he could see that there was a clear plastic baggie inside the bag, and that inside the clear plastic baggie was a bundle wrapped in tape. From his training and experience, the bundle appeared to him to be cocaine packaged for distribution. The detective then advised the defendant that he was under arrest.
 
 
 7
 As to what happened at the train station on August 9, 1991, the defendant testified to a significantly different version of the facts than the detective had. According to the defendant, the detective used words of command throughout the encounter. He testified that the detective stated "show me your ticket," or "[m]uestrame los papeleo." He stated that the detective then asked "[d]o you have papers," which the defendant understood as asking whether he had an immigration card. The defendant handed him his entire wallet, the papers inside of which identified him as Roberto Lizarraga-Ramirez. Without returning his wallet or his ticket, the defendant testified, the detective said "[s]how me your bag," again using the Spanish command, "muestramelo." The defendant felt that the detective was imposing an order. He further testified that in his experience living in Mexico, one must cooperate with law enforcement agents or they will use force, and one may not refuse to talk with officers or refuse to consent to a search. Given his personal experience with law enforcement officers in Mexico and the Albuquerque detective's choice of words, the defendant testified that he felt that he had to do what the detective told him to. According to the defendant, the detective never returned his ticket or identification, and never told him that he could refuse to show him his bag.
 
 
 8
 The defendant admitted that after he opened the carry-on bag, he began moving clothes around with the hope that he could hide the paper bag containing the cocaine from the detective's view. Contrary to the detective's statements, the defendant testified that the paper bag was folded over, such that the detective could not have seen inside the paper bag. The defendant stated that once the detective saw the paper bag, he cuffed and arrested the defendant. After moving the defendant to a wall, he took the bag and moved to the other side of the building. The defendant testified that only then did the detective open the paper bag to see inside of it; he had not opened the paper bag before that point or before arresting the defendant. The defendant stated that he did not give the detective permission to touch his belongings, that the detective did not ask permission to open the bag, and that nothing was leaking out of the taped package. Nor did the defendant see a dog sniff his bag. He was shown no warrant for the search.
 
 
 9
 After hearing the testimony of the detective and the defendant at a suppression hearing on November 21, 1991, the district court made oral findings of fact. As an initial matter, the court stated that he felt the defendant lacked credibility. The court found that the detective used words of request when asking the defendant if he could see his identification, bag, and the like, rather than words of command, like "muestrame." The court found that the defendant voluntarily showed the detective the train ticket issued in Jose Chavez's name, and noted that the defendant's story of how he came into possession of the ticket lacked credibility. Furthermore, the court found that the detective asked if he could look in the defendant's bag, and that the defendant voluntarily and specifically consented to the examination of the contents of the bag. Last, the court found that the detective followed the routine policy of the Albuquerque Police Department in connection with meeting and questioning passengers in train stations, and that the detective returned the defendant's train ticket and identification.[2] Thus, the court denied the motion to suppress.
 
 
 10
 On January 10, 1992, the defendant entered a conditional guilty plea to the indictment. On March 20, 1992, the district court sentenced the defendant to sixty months of confinement to be followed by four years of supervised release. The defendant now appeals the district court's denial of his motion to suppress, contending that (1) his encounter with the detective was not a voluntary encounter but rather an illegal seizure unsupported by reasonable suspicion, and (2) the evidence obtained as a result of the search of the bag should be suppressed, because the search was tainted by the illegal detention and because he did not consent to the search such that the taint was dissipated. We will address each contention in turn.
 
 II. SEIZURE OR CONSENSUAL ENCOUNTER
 
 11
 As an initial matter, we must decide whether the encounter between the defendant and the detective at the train station was a consensual encounter or an investigative detention requiring reasonable suspicion.
 
 
 12
 The ultimate issue of whether a seizure occurred is a question of law, which we review de novo. United States v. Ward, 961 F.2d 1526, 1534 (10th Cir.1992) (citing United States v. McKines, 933 F.2d 1412, 1424 (8th Cir.) (en banc), cert. denied, 112 S.Ct. 593 (1991)). However, the district court's findings as to the underlying facts--such as what the various parties said or did--are reviewable under the clearly erroneous standard. See United States v. Bloom, 975 F.2d 1447, 1450 (10th Cir.1992); McKines, 933 F.2d at 1426.
 
 
 13
 The Supreme Court has articulated the test that governs our inquiry:
 
 
 14
 [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.
 
 
 15
 United States of America v. Zapata, 1993 WL 218447 * 3 (10th Cir.) (quoting Florida v. Bostick, 111 S.Ct. 2382, 2386 (1991)). We have expanded upon this test, enumerating several circumstances to be considered in determining whether a police-citizen encounter rises to the level of a seizure: (1) the location of the encounter, particularly whether the defendant is in an open public place within the view of persons other than law enforcement officers; (2) whether the officers touch or physically restrain the defendant; (3) whether the officers are in uniform or in plain clothes; (4) whether their weapons are displayed; (5) whether and for how long the officers retain the defendant's personal effects, such as tickets or identification; and (6) whether the officers specifically advised the defendant at any time that he had the right to terminate the encounter or to refuse consent. Zapata, 1993 WL 218447 at * 4 (citations and quotations omitted). As in Zapata, nearly all of these factors indicate that the encounter between the defendant and the detective was consensual.
 
 
 16
 The encounter took place in an open public place, just outside of the depot, in an area where passengers wait for taxis and other vehicles to pick them up. As to whether the detective attempted to touch or physically restrain the defendant, the detective testified that the defendant was free to leave at any time before the cocaine was found.[3] The detective was not in uniform, and had no weapons or handcuffs visible. Only one detective questioned the defendant, and he used a "conversational or casual tone." Furthermore, the district court found that the detective did not use the Spanish command "muestrame" or "muestramelo" when asking the defendant for permission to see his bag. The district court also found that the detective returned the defendant's train ticket after briefly examining it and that he also returned the defendant's identification. We cannot say that these findings are clearly erroneous. Although it is true that the detective did not inform the defendant that he had the right to terminate the encounter or refuse consent, " 'this one factor by itself does not determine whether a seizure has occurred.' " Zapata, 1993 WL 218447 * 4 (quoting United States v. Ward, 961 F.2d 1526, 1533 (10th Cir.1992)). We hold that the failure to inform the defendant of his right to terminate the encounter did not render the encounter a seizure in light of the other factors, which clearly indicate the encounter was consensual.[4]
 
 III. VOLUNTARINESS OF CONSENT
 
 17
 We next consider whether the defendant voluntarily consented to the search of his bag. We determine the voluntariness of the defendant's consent to the search of his bag under the totality of the circumstances. Zapata, 1993 WL 218447 * 5 (citations omitted). " 'The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.' " Id. (quoting United States v. Nicholson, 983 F.2d 983, 988 (10th Cir.1993)). We review only for clear error the district court's finding that the defendant's consent was voluntary. See id. We hold that the finding was not clearly erroneous.
 
 
 18
 The defendant contends that his consent was involuntary for two reasons: (1) the detective ordered him to show him his bag, and (2) his experience with police in Mexico led him to believe that he did not have the right to refuse to consent to the search. We will address each contention in turn.[5]
 
 
 19
 First, as we noted in the previous section, the district court specifically found that the detective did not order the defendant to permit him to search the bag by using the term "muestrame." In so finding, the district court specifically noted that it found the defendant's testimony lacking in credibility. We cannot say that this finding was clearly erroneous.
 
 
 20
 Second, we reject the defendant's assertion that his consent was involuntary because he believed that, as in Mexico, persons in the United States must talk to law enforcement officers and give their consent to search, or the officers will use force. We have recently rejected the notion that a defendant's attitude toward police can constitute a subjective characteristic relevant to the validity of consent. Zapata, 1993 WL 218447 * 6-7. We noted in Zapata that an intangible characteristic such as attitude toward authority is inherently unverifiable and unquantifiable. Id. at * 7. We therefore reject the defendant's contention that because of his cultural background, his consent to search was involuntary.[6] Because we held in Part I of this opinion that the defendant's initial encounter with the detective was consensual, it also follows that the defendant's consent was not tainted by an unlawful detention. We therefore AFFIRM the district court's denial of the motion to suppress.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 At the suppression hearing, the detective related in Spanish the questions he asked the defendant at the depot, and a translator translated the statements into English
 
 
 [2]
 The court found that the agent followed police procedure, which required the return of a citizen's identification after a brief inspection. The court explicitly found that the agent returned the train ticket after a brief inspection
 
 
 [3]
 Although the defendant testified that the detective did not see the cocaine until after he had handcuffed the defendant, the district court found the detective's version of the sequence of events was more credible, and we do not conclude that this finding was clearly erroneous
 
 
 [4]
 We have previously rejected the defendant's argument that the district court should consider the defendant's background and upbringing outside of the United States in determining whether a seizure has occurred. See Zapata, 1993 WL 218447 * 5. The particular personal traits or subjective state of mind of the defendant are irrelevant to the legal question of whether a seizure has occurred by virtue of the police conduct involved, other than to the extent that they may have been known to the officer and influenced his conduct. Id. (citations omitted). The legal question of whether a seizure has occurred is an objective test: "would 'the police conduct ... have communicated to a reasonable person that the person was not free to decline the officers' requests....' " Id
 
 
 [5]
 The defendant also argues that the detective's request for consent was not unequivocal and that, therefore, his consent was not voluntary. However, we note that the proper focus is not the detective's question but rather whether the defendant's grant of permission to search was unequivocal. Here, in response to the detective's statement, "Please, what can I see in your luggage, what can I look for drugs in your luggage," the defendant said "yes," and unzipped his bag. Given this evidence, we do not believe that the district court's finding that the defendant specifically consented to the search of his bag was clearly erroneous
 
 
 [6]
 We note that even if a defendant's subjective attitude toward authority were relevant, the district court was entitled to find on these facts that the defendant's background did not render his consent involuntary. The defendant testified that he had been in the United States for four years, had traveled to Albuquerque several times, and knew that it was illegal to smuggle cocaine. He understood how to operate a telephone. It would be reasonable to infer that during the four years he spent in this country he would have learned of the difference between Mexican and American police conduct