**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Richard W. LABOY, Defendant–Appellee.**

**No. 92–1115.**

United States Court of Appeals, Tenth Circuit.

Nov. 9, 1992.

John M. Hutchins, Asst. U.S. Atty., (Michael J. Norton, U.S. Atty., Kathleen M. Tafoya, Guy Till, Asst. U.S. Attys., with him on the brief), Mountain States Drug Task Force, Denver, Colo., for plaintiff-appellant.

Charles Szekely, Asst. Federal Public Defender, (Michael G. Katz, Federal Public Defender, with him on the brief), Denver, Colo., for defendant-appellee.

Before BRORBY, McWILLIAMS, and KELLY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

The government appeals from the district court's suppression of physical evidence. Defendant–Appellee Laboy was indicted for possession with intent to distribute crack cocaine and carrying a firearm in connection with a drug trafficking crime. 21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. §§ 2, 924(c). Following a hearing, the district court suppressed evidence seized at an initial sidewalk arrest and at the follow-up arrest at the high school Mr. Laboy attended. The district court concluded that the initial encounter between Mr. Laboy and the police constituted a "seizure" for Fourth Amendment purposes, since a reasonable person would not have felt free to leave. The district court further found that this seizure was unreasonable since it was unsupported by any reasonable suspicion of criminal activity, and therefore ordered suppression of the immediate fruits of that arrest (a small amount of crack cocaine and a nine millimeter handgun). According to the district court, the subsequent federal arrest warrant and the evidence seized under that arrest warrant (a notebook containing allegedly gang- and drug-related notations) were the tainted product of the initial unreasonable seizure. Our jurisdiction to review the district court's suppression order arises under 18 U.S.C. § 3731. We hold that the initial encounter did not constitute a "seizure" that implicates the Fourth Amendment and reverse.

## Background

In February 1992, Detective Jesus Quinones was part of a support team for an undercover narcotics operation at an apartment house in Denver, Colorado. He was dressed in plain clothes and waited outside of the building in an unmarked car with another officer, who wore a raid vest bearing the police logo and carried a submachine gun. Four other undercover officers assisted.

Following a distress signal from the undercover officer making the buy inside the building, Detective Quinones ran into the building and assisted two other officers in escorting three prisoners to the rear of the building, where they were lined up against a wall. Two of these prisoners were handcuffed with their backs to the wall so that the handcuffs were not visible to passersby on the street. The third prisoner was facing the street and was not handcuffed. Detective Quinones was the only officer standing next to the three prisoners and his service revolver was out of sight.

Mr. Laboy was walking on the other side of the street. Detective Quinones and Mr. Laboy made eye contact, and acknowledged each other with nods. Detective Quinones then waved at Laboy, signalling him to come over. Mr. Laboy did so. Detective Quinones testified:

I asked him, I said, "You got any stuff?" And then he [Mr. Laboy] told me, "Yeah, what are you looking for?" That's when I told him [Mr. Laboy] a "twenty."

. . . .

He [Mr. Laboy] said yeah, I do, or "Yeah, I do have some stuff, . . . "

II R. 14–15. Mr. Laboy testified that he knew that he was watching an arrest in progress, and he interpreted Detective Quinones' gestures to him as a sign that he was being arrested, and felt that he might be shot if he tried to run away. Mr. Laboy indicated that Detective Quinones asked him if he had any stuff, to which Mr. Laboy responded yes, and thereafter Mr. Laboy was arrested.

The district court framed the inquiry as "whether under the totality of the circumstances a reasonable person in the position of Richard Laboy would believe that he was not free to leave the area and ignore the detective's questions." I R. doc. 9 at 2–3. The court then ruled that "the defendant perceived that he was being arrested and that his perception was reasonable." *Id.* at 3. Although the district court found that the neighborhood was known for street-level drug dealing, the district court found Detective Quinones' testimony was implausible because "[i]t is difficult to believe that anyone would voluntarily engage in a drug transaction with another person in the immediate presence of three other people." *Id.* In supplemental findings, the district court emphasized that Detective Quinones had no reasonable suspicion to stop Mr. Laboy.

### Discussion

■ We accept the district court's factual findings unless clearly erroneous, but the ultimate determination of the reasonableness of any search or seizure is a question of law reviewed *de novo* by this court. *United States v. Ibarra,* 955 F.2d 1405, 1409 (10th Cir.1992). We have recognized three basic types of encounters with police officers: voluntary cooperation, *Terry* investigative stops, and arrests. A voluntary encounter involves the voluntary cooperation of a citizen with noncoercive questioning. Voluntary encounters are not considered seizures within the meaning of the Fourth Amendment and do not raise any constitutional issues. *United States v.*

*Morgan,* 936 F.2d 1561, 1566 (10th Cir. 1991) (citing *United States v. Santillanes,* 848 F.2d 1103, 1106 (10th Cir.1988)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992). A *Terry* investigative stop is a brief, nonintrusive detention during preliminary questioning or a frisk for weapons. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). *Terry* stops are considered seizures, which must be supported by a reasonable suspicion that a person has committed or is committing a crime. *Id.* The final category is an arrest, which is characterized as highly intrusive and involves detention. Arrests must be supported by probable cause to believe that a person has committed or is committing a crime. *Morgan,* 936 F.2d at 1566.

■ We resolve this case on one question: whether, given all the surrounding circumstances, the wave of the detective's hand and subsequent questioning constituted a show of authority sufficient to make a reasonable person believe that he or she was not free to leave. *See Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991); *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Bloom,* 975 F.2d 1447, 1451 (10th Cir.1992). To constitute a seizure, there must be some show of authority and a submission to that authority. *California v. Hodari D.,* —— U.S. ——, ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2386. As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity. *Id.*

Courts have identified several factors to assist in the analysis of whether a reasonable person would believe the police officer's actions to be coercive, and that he or

she was not free to disregard the officers. A nonexclusive list of some of these factors includes: the threatening presence of several officers; a display of a weapon by an officer; some physical touching by an officer; use of language or tone of voice indicating that compliance with officer was compulsory; prolonged retention of a person's personal effects such as plane tickets, identification or luggage; a request to accompany the officer to the station; whether the encounter occurred in a nonpublic place; and whether the encounter took place in a small, enclosed space. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *Berkemer v. McCarty*, 468 U.S. 420, 438, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984); *Bloom*, 975 F.2d at 1454; *United States v. Ward*, 961 F.2d 1526, 1533 (10th Cir.1992); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir.1991).

 The undisputed facts of this case reveal that *none* of these factors were perceived by Mr. Laboy, nor would they have been perceived by a reasonable person in his position. The police, in the middle of an undercover operation, had taken every possible precaution to ensure that there were no outward signs of police presence. Although six officers participated in the operation, only Detective Quinones was visible to Mr. Laboy. Even had the other officers been visible to Mr. Laboy, only one officer was wearing anything that would have identified him as a law enforcement official, and that officer was inside an unmarked police car, not visible to Mr. Laboy at the time of the encounter. No firearms were visible to Mr. Laboy. Not only was Mr. Laboy not touched by the officers, he was, even by his own estimate, at least twenty-five yards from Detective Quinones at the time he claims to have been compelled to cross the street. There is no claim that Detective Quinones used an intimidating tone of voice or language to compel Mr. Laboy to cross the street. In fact, the detective's verbal communication

with Mr. Laboy began only after Mr. Laboy had crossed the street. The encounter occurred on a public street, fully exposed to public view. Moreover, merely motioning a person to approach a police officer, unaccompanied by verbal communication or show of force, is not inherently coercive.[1] Although Detective Quinones never explicitly told Mr. Laboy he did not have to cooperate, such advice was unnecessary. *See INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told that they are free not to respond, hardly eliminates the consensual nature of the response.... Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment."); *Bloom*, 975 F.2d at 1455; *Ward*, 961 F.2d at 1533; *United States v. Lloyd*, 868 F.2d 447, 451 (D.C.Cir.1989). We conclude as a matter of law that a reasonable person would have felt free not to cross the street and encounter Detective Quinones. Just as "a seizure does not occur simply because a police officer approaches an individual and asks a few questions," *Bostick*, —— U.S. at ——, 111 S.Ct. at 2386, a seizure does not occur simply because an officer waves at a person, signalling him to come over, and then asks a few questions.

The district court placed too much emphasis on Mr. Laboy's subjective state of mind. The appropriate inquiry is an objective one: whether a reasonable innocent person would have felt free to leave. *Chesternut*, 486 U.S. at 574, 108 S.Ct. at 1980; *Bostick*, —— U.S. at ——, 111 S.Ct. at 2388, *Florida v. Royer*, 460 U.S. 491, 519, n. 4, 103 S.Ct. 1319, 1335, n. 4, 75 L.Ed.2d 229 (1983). Thus, we have no difficulty in reconciling our holding that a rea-

---

1. Contrary to the dissent's suggestion, we do not ignore the fact that Detective Quinones signalled to Mr. Laboy. Our analysis focuses on whether the Detective's actions, when viewed in light of all the surrounding circumstances and the con-

trolling law of *Florida v. Bostick*, —— U.S. at ——, 111 S.Ct. at 2386, constituted a show of authority sufficient to make a reasonable person believe that he or she was not free to leave.

sonable person would feel free to disregard Detective Quinones' actions with the district court's determination that Mr. Laboy thought that he was being arrested.

Because we conclude that the initial encounter between Mr. Laboy and Detective Quinones was not a seizure, and did not offend the Fourth Amendment, the evidence seized during that arrest should not have been suppressed. Similarly, the subsequent federal warrant and the evidence seized under that warrant are free from taint and should not have been suppressed.

REVERSED and REMANDED.

BRORBY, Circuit Judge, dissenting.

I dissent.

The district court's factual findings can only be reversed if they are found to be clearly erroneous. *United States v. Ibarra,* 955 F.2d 1405, 1409 (10th Cir.1992). The evidence on appeal must be viewed in the light most favorable to the district court findings. *Id.* Nothing in the record persuasively suggests the district court's findings of fact are in error.

The district court, in its factual findings, stated as follows:

> Richard W. Laboy, an 18 year old black man, was walking northward on the west side of Washington Street. Mr. Laboy looked over to the parking lot behind the apartment complex and saw the three black men against the wall with Detective Quinones standing out in front of them and looking across Washington Street. Mr. Laboy and Detective Quinones made eye contact and acknowledged each other's presence with head nods. Detective Quinones then *waived* [sic] *to signal Mr. Laboy that he should come over to Detective Quinones.* Mr. Laboy walked across the street and came up to within about ten feet of Detective Quinones, a total distance of about 100 feet.
>
> . . . .

... Mr. Laboy testified that it was obvious to him that the three black men lined up against the wall were under arrest and that he, too, was being arrested when Detective Quinones waved him over.

Findings, Conclusions and Order at 1–2 (emphasis added).

The majority set forth the controlling law when it cited *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), and framed the inquiry as whether the totality of the circumstances constituted a show of authority sufficient to make a reasonable person believe that she or he was not free to leave.[1]

The majority sets forth a nonexclusive list of factors courts have used in conducting their analysis of whether or not the police officer's actions were inherently coercive and found none of the factors present. The majority ignores the fact that the police officer demonstratively signaled Mr. Laboy to come to his presence. Given our society's propensity to obey the reasonable requests of police officers, I believe common sense is ignored by holding the actions of the police officer in signaling Mr. Laboy to cross the street and appear in front of the officer were not inherently coercive.

A nonverbal hand signal ordering a person to cross a street and travel 100 feet to the police officer's presence would not lead a reasonable person to believe he or she was free to ignore the police officer's directives and questions.

I would add to the list of factors to be utilized in analyzing the question of whether or not a police officer's actions are coercive, the conduct of the police officer including the nonverbal commands issued by the police officer. Applying this factor to the analysis, I would affirm the judgment of the district court.

---

**1.** I disagree with the majority's classification of the *Bostick* inquiry as to whether a reasonable person feels free to leave. More accurately, the Supreme Court frames the standard as whether a reasonable person *would* feel free to decline the officer's request or otherwise terminate the encounter. *Bostick,* —— U.S. at ——, 111 S.Ct. at 2384. In this case, however, the distinction is irrelevant.