**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MARLAND LAMONT HILL,

    Defendant - Appellant.

No. 99-2122

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR-98-425-BB)

---

Alonzo J. Padilla, Assistant Federal Public Defender, Albuquerque, New Mexico, for Appellant.

David N. Williams, Assistant United States Attorney (John J. Kelly, United States Attorney and James D. Tierney, Assistant United States Attorney, on the brief), Albuquerque, New Mexico, for Appellee.

---

Before **ANDERSON** , **PORFILIO** , and **EBEL** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

Marland Lamont Hill entered a conditional plea of guilty to one count of possession with intent to distribute ten grams or more of phencyclidine ("PCP"), in violation of 21 U.S.C. §§ 841(a) and (b)(1)(B). He brought this appeal challenging the district court's denial of his motion to suppress evidence found during a search of his luggage while on a bus in Gallup, New Mexico. We affirm.

## BACKGROUND

During April and May of 1998, McKinley County, New Mexico, deputy sheriff George Justice routinely conducted narcotics searches of carry-on luggage on buses stopped at the Gallup, New Mexico, port of entry from Arizona. All buses entering New Mexico from Arizona stopped at the port of entry to permit inspection of the buses and license verification. Bus driver Vernon Wittner testified that passengers always stayed on the bus while Deputy Justice conducted his searches. The searches lasted anywhere from twenty minutes to an hour.

At approximately 12:40 p.m. on May 28, 1998, Deputy Justice asked and was granted permission by Greyhound bus driver Steve Beach to question the passengers on his bus while it was stopped at the port of entry. Deputy Justice boarded the bus, dressed in plain clothes but with his badge visible on his belt and a gun in its holster on his right hip. He stood at the front of the bus, beside the only exit, and announced, "My name is George Justice. I'm from McKinley

County Sheriff's Department, Narcotics Interdiction Unit. I'm going to start at the rear of the bus, work my way forward. If you would please identify your carry-on luggage." Vol. III Tr. at 12. He proceeded to the back of the bus and began asking each passenger about his or her travel itinerary. He also asked each passenger to identify his or her carry-on luggage. He testified that he asked every fourth passenger if he could search his or her carry-on luggage. See id. at 9, 48. He further testified that when he asked permission to search, he "always told them that they did not have to let [him] search their luggage." Id. at 10. When he questioned passengers, he stood in the aisle to the rear of their seat, so that "at times [he] would have to lean in." Id. at 50. He further testified that he estimated the width of the bus aisle to be three and one half feet. See id. at 49. Deputy Justice is six feet one inch tall and weighs 185 pounds.

Mr. Hill was seated in the window seat approximately mid-way towards the rear of the bus. He was twenty-one years old at that time. Another passenger sat in the aisle seat next to him. Deputy Justice testified that, when he reached Mr. Hill's seat, he asked him if he had any carry-on luggage. Id. at 15. When Mr. Hill answered affirmatively, Deputy Justice asked him to identify it, which Mr. Hill did, indicating that it was a blue bag in the overhead compartment towards the front of the bus. Deputy Justice then inquired about Mr. Hill's travel itinerary. He testified that Mr. Hill indicated he had attended a funeral in

California and was returning home to Tulsa, Oklahoma. See id. at 17. Deputy Justice then asked Mr. Hill if he could search his blue carry-on bag. The deputy stated that he specifically told Mr. Hill that he did not have to permit the deputy to search the bag. Deputy Justice testified that Mr. Hill gave him permission to search the bag. See id. The deputy further testified that, at that time, Mr. Hill "was sitting with his hands near his lap, and he was visibly shaking." Id.

Deputy Justice continued questioning passengers, working his way toward the front of the bus and toward Mr. Hill's bag. When he reached the bag, he "pulled the bag out." Id. at 18. He testified that he "turned to Mr. Hill and said, 'Is this your bag?' And he advised yes." Id. at 18-19. Deputy Justice stated he asked, "'Are you sure I can look in your bag?'" and that Mr. Hill responded "yes." Id. at 19. When the deputy opened the bag, he "smelled a very strong chemical odor" which he testified he "believed to be PCP, phencyclidine." Id.[1] Deputy Justice then "advised [Mr. Hill] to come off the bus with [him.]" Id. at 20. They both exited the bus.

Once outside the bus, the deputy asked Mr. Hill if everything in the bag was his, to which Mr. Hill answered affirmatively. Inside a pair of pants in the bag Deputy Justice found a sock containing nine small brown bottles. When he

---

[1]Deputy Justice testified he was familiar with the smell of PCP from four prior cases involving the drug. Vol. III Tr. at 19.

opened one of the bottles, he "smelled a very strong chemical odor . . . an overwhelming odor that PCP emits." Id. at 24. Deputy Justice testified that, when he stated that the bottle appeared to contain PCP, Mr. Hill replied that the liquid was ginseng purchased for him by his uncle in California. Id. at 25.

Deputy Justice then asked Mr. Hill for identification, and Mr. Hill gave him an Oklahoma identification card with his correct name on it. The deputy ran a computer check on the card which apparently revealed nothing unusual. Deputy Justice then returned the card to Mr. Hill. Deputy Justice also asked his dispatch center to check with a health food store on the smell and appearance of ginseng, and was told that "ginseng had little to no odor." Id. at 26. At that point, Deputy Justice "advised Mr. Hill that [he] believed the substance to be phencyclidine or PCP, and advised him that [he] was going to seize it, but he [Mr. Hill] was free to leave." Id. at 27. Mr. Hill got back on the bus with his bag, and Deputy Justice retained the sock and nine bottles.

Deputy Justice then contacted Albuquerque DEA agent Kevin Small and advised him of the seizure of Mr. Hill's bottles and told Agent Small that he believed they contained PCP. Agent Small indicated he would attempt to identify Mr. Hill when the bus arrived in Albuquerque. Deputy Justice subsequently conducted a field test on the substance in the bottles, which tested positive for PCP. Agent Small contacted Mr. Hill when the bus arrived in Albuquerque, and

Mr. Hill initially denied any contact with Deputy Justice. Deputy Justice then met Agent Small at the Albuquerque bus station and handed him the bottles seized from Mr. Hill. The two officers subsequently arrested Mr. Hill.

Mr. Hill filed a motion to suppress the bottles found in the blue bag, along with any statements he made, arguing that the encounter with Deputy Justice was a non-consensual seizure for which Deputy Justice lacked reasonable suspicion. The district court denied the motion to suppress, holding as follows:

> Well, I would indeed grant the request and quash the evidence, but for the fact that Agent Justice specifically told the defendant he was not required to give consent to the search. I think that is the one distinguishing factor . . . . I think the circumstances are otherwise coercive, and the defendant's objective consent to search, after being told – after being told he was not required to consent, I think negates those other coercive factors.

Id. at 117-18. Mr. Hill conditionally pled guilty, and this appeal followed.


**DISCUSSION**

"When reviewing a district court's denial of a motion to suppress, we accept its factual findings unless clearly erroneous and view the evidence in the light most favorable to the government." United States v. Hargus, 128 F.3d 1358, 1361 (10th Cir. 1997). However, the ultimate determination of Fourth Amendment reasonableness is a question of law which we review de novo. See

United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).  As this court

has repeatedly recognized, there are:

> three categories of police-citizen encounters:  (1) consensual
> encounters which do not implicate the Fourth Amendment[;]
> (2) investigative detentions which are Fourth Amendment seizures of
> limited scope and duration and must be supported by a reasonable
> suspicion of criminal activity[;] and (3) arrests, the most intrusive of
> Fourth Amendment seizures and reasonable only if supported by
> probable cause.

United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996) (quotations

omitted).  In determining whether a police-citizen encounter is consensual, "the

crucial test is whether, taking into account all of the circumstances surrounding

the encounter, the police conduct would 'have communicated to a reasonable

person that he was not at liberty to ignore the police presence and go about his

business.'"  Florida v. Bostick, 501 U.S. 429, 437 (1991) (quoting  Michigan v.

Chesternut, 486 U.S. 567, 569 (1988));  see also  United States v. Little, 18 F.3d

1499, 1503 (10th Cir. 1994) (en banc).  No per se or absolute rules govern this

inquiry.  See Ohio v. Robinette, 519 U.S. 33, 39 (1996);  Little, 18 F.3d at

1503-04.  "Rather, every case turns on the totality of the circumstances

presented."  Little, 18 F.3d at 1503.

We have identified various factors relevant to whether a reasonable person

would not feel free to terminate the encounter with police:

> the threatening presence of several officers; the brandishing of a
> weapon by an officer; some physical touching by an officer; use of

aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). We have "steadfastly refused to view any one of these factors as dispositive." United States v. Glass, 128 F.3d 1398, 1406 (10th Cir. 1997).

Mr. Hill argues that the encounter between himself and Deputy Justice was a non-consensual and unlawful seizure, because a reasonable person in Mr. Hill's position would not have felt free to terminate the encounter or ignore the deputy's questions. He argues that his consent to search his bag was the product of that unlawful seizure and was, therefore, involuntary. Without making extensive or specific factual findings, the district court held that the encounter was consensual. In so doing, the court appeared to give determinative weight to the fact that Deputy Justice specifically told Mr. Hill that he need not consent to a search of his bag, stating that the deputy's advisement "negates those other coercive factors." Vol. III Tr. at 118.

We affirm the district court's ultimate conclusion that the encounter did not violate the Fourth Amendment, although we do so on slightly different grounds than the district court. Bearing in mind that no single factor is determinative, we conclude that the totality of the circumstances surrounding the encounter between

Deputy Justice and Mr. Hill indicate that the encounter was consensual and that Mr. Hill's consent to search his bag was voluntary. To the extent it became a non-consensual investigative detention when Deputy Justice asked Mr. Hill to exit the bus with him, Deputy Justice had, at that point, reasonable suspicion that criminal activity was occurring based upon the PCP smell emanating from Mr. Hill's bag.

The undisputed facts indicate that Deputy Justice boarded the bus alone, in plain clothes but with a badge and holstered gun visible. [2] The encounter occurred on a bus, but in view of the other passengers on the bus. While the bus may have been a more confining and cramped environment than other locations, the Supreme Court and this court have held repeatedly that the location of the encounter is but one factor in the totality of the circumstances. See Bostick, 501 U.S. at 439 ("The cramped confines of a bus are one relevant factor that should be

---

[2]Mr. Hill argues that Deputy Justice was not really alone, because armed uniformed motor transportation officers were in the general vicinity of the bus. The district court made no finding on that point. Even assuming transportation officers were in the vicinity of the bus, that circumstance is different from cases where the presence of multiple officers in the actual encounter with the citizen weighs in favor of coerciveness. Cf. United States v. Ward, 961 F.2d 1526, 1530 (10th Cir. 1992) (noting that among factors suggesting that encounter was a seizure was fact that two officers together approached defendant in train roomette), overruled in part by United States v. Little, 18 F.3d 1499 (10th Cir. 1994) (en banc).

considered in evaluating whether a passenger's consent is voluntary."); <u>Little</u>, 18 F.3d at 1504.

Mr. Hill argues Deputy Justice effectively blocked access to the bus's only exit in front, thereby rendering the encounter more coercive. The district court made no findings on that point. However, from the undisputed description of where Deputy Justice stood while questioning passengers (standing in the aisle at the rear of their seat, necessitating that he occasionally "lean in" to talk to the passenger), it appears he did not block such access. <u>Cf.</u> <u>United States v. Kim</u>, 27 F.3d 947, 952 (3d Cir. 1994) (noting among factors contributing to conclusion that encounter was consensual was fact that officer did not block exit). Thus, in this case, the bus setting and the particulars of Deputy Justice's movements within the bus do not favor a finding of coercion.

Mr. Hill argues that Deputy Justice's tone, demeanor and the nature of his questions were threatening and coercive. The district court made no specific findings on the deputy's tone or manner of questioning. Deputy Justice testified that he felt his manner was "very friendly." Vol. III Tr. at 54. No contradictory evidence was presented. Mr. Hill argues the deputy asked him potentially incriminating questions, and that rendered the encounter more coercive. Although Deputy Justice announced that he was from the narcotics interdiction unit, thereby implying his purpose was to look for drugs, his actual questioning of passengers

related only to their travel itineraries and the whereabouts of their carry-on luggage. Even assuming that those questions could be viewed as potentially incriminating, our en banc court has stated that " Bostick specifically observed that police officers ask such questions, and in no way suggested that there is anything unlawful in the practice." Little, 18 F.3d at 1506. See Bostick, 501 U.S. at 439 (noting that "proposition that police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions" is "by no means novel" and in fact "has been endorsed by the Court any number of times"). Thus, this factor also fails to support a conclusion of coercion.

Mr. Hill also suggests that he was more vulnerable to coercion by police officers, and more inclined to comply with police requests whether he really wanted to or not, because of prior negative experiences with police officers.[3] We have stated repeatedly "that the particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test set out in Bostick, 'other than to the extent that they may have been known to the officer and influenced his conduct.'" Little, 18 F.3d at 1505 (quoting United States v. Bloom, 975 F.2d 1447, 1455 n.9 (10th Cir. 1992), overruled in part by

_____

[3]Mr. Hill was apparently shot without justification by a police officer when he was twelve years old. This incident resulted in serious injury to him. At a later time he was beaten by the same police officer.

-11-

United States v. Little , 18 F.3d 1499 (10th Cir. 1994) (en banc)); see also

Sanchez , 89 F.3d at 718; United States v. Zapata , 997 F.2d 751, 757 (10th Cir.

1993); United States v. Laboy , 979 F.2d 795, 799 (10th Cir. 1992). There is no

evidence that Deputy Justice was aware of Mr. Hill's attitude toward police

officers, based as it was upon Mr. Hill's unfortunate childhood experiences, so

this factor is irrelevant to the consensual or non-consensual nature of the

encounter.

Mr. Hill further argues that the deputy's failure to specifically advise

Mr. Hill, or any other passenger, that they did not have to answer his questions

rendered the encounter a non-consensual seizure. "There is no per se rule

requiring such an advisement." Little , 18 F.3d at 1505; see also United States v.

Anderson , 114 F.3d 1059, 1064 (10th Cir. 1997) ("While [the officer] did not

specifically tell [defendant] that he was free to leave, that is not required for an

encounter to be consensual."). Moreover, as the district court particularly noted,

Deputy Justice did tell Mr. Hill that he need not permit him to search his carry-on

bag. "While we do not suggest that an advisement concerning answering

questions is the same as an advisement concerning the search of luggage, . . . [the

officer's] unambiguous and explicit advisement concerning the search of [Mr.

Hill's] luggage is relevant to the totality of the circumstances surrounding the

encounter." Little , 18 F.3d at 1505.

-12-

In sum, we affirm the district court's conclusion that the encounter between Mr. Hill and Deputy Justice was consensual, but on the ground that the totality of the circumstances, including the deputy's explicit advisement that Mr. Hill need not consent to a search of his luggage, indicate that a reasonable person would have felt free to terminate the encounter. [4]

Mr. Hill further argues that his consent to search his luggage was involuntary. "When the government relies on a defendant's consent for the validity of a search, the government bears the burden of proving that defendant's consent was freely and voluntarily given, a determination we make by evaluating the totality of the circumstances." Sanchez, 89 F.3d at 718. Mr. Hill argues that "[t]he same factors that rendered deputy Justice's interrogation of Mr. Hill a seizure also rendered Mr. Hill's consent involuntary." Appellant's Brief-in-Chief at 19. We have concluded that Deputy Justice's questioning of Mr. Hill was not a seizure. We conclude that those same factors do not render involuntary Mr. Hill's

---

[4]Mr. Hill places great reliance upon a recent Eleventh Circuit case, United States v. Guapi, 144 F.3d 1393 (11th Cir. 1998), in which the court held that a bus passenger's consent to search his bag was involuntary. Guapi is factually distinguishable in significant ways from this case: in Guapi, two officers boarded the bus, one in full uniform; they specifically told the passengers that they would be inspecting everyone's carry-on luggage for illegal contraband; they never informed passengers that they did not have to consent to the search of their bags; the officer conducting the search of each bag stood in front of each passenger, thereby blocking access to the only exit. Because each case turns upon the totality of the circumstances presented in the particular case, such factual distinctions are significant.

otherwise unequivocal consent, which he gave twice, to a search of his bag.     See

Anderson , 114 F.3d at 1064-65 (holding that consent to search given during a

consensual encounter was voluntary).    [5]  No other relevant evidence indicates that

Mr. Hill's consent was involuntary.     See United States v. Mendez   , 118 F.3d 1426,

1432 (10th Cir. 1997) (holding that consent given with "no signs of coercion or

duress" during a lawful detention was voluntary).  While Mr. Hill's "subjective

state of mind" regarding police officers "may be relevant to some degree to the

issue of the voluntariness of [his] consent,"     Zapata , 997 F.2d at 757, we hold that,

in this case, it does not overcome the other indicia that Mr. Hill's consent was

freely and voluntarily given.

 For the foregoing reasons, the decision of the district court denying

Mr. Hill's motion to suppress is AFFIRMED.

---

[5]Mr. Hill's primary argument on appeal is that the consent was involuntary because it occurred during an illegal detention.  This particular argument fails with our conclusion that there was no illegal detention.