**UNITED STATES of America,**
**Plaintiff,**

v.

**Simon TRUJILLO, Defendant.**

**No. 2:03–CR–030 DB.**

United States District Court,
D. Utah,
Central Division.

April 16, 2004.

---

John B. Hutchison, Ogden, UT, Richard G. MacDougall, Kristen B. Angelos, Utah Federal Defender Office, Salt Lake City, UT, for Defendant.

Trina A. Higgins, U.S. Attorney's Office, Salt Lake City, UT, for United States.

## MEMORANDUM OPINION AND ORDER

BENSON, Chief Judge.

### INTRODUCTION

During the early morning hours of November 23, 2002, Defendant Simon Trujillo was found in possession of a 9 mm Keltec pistol. He was subsequently indicted for possession of a firearm by a restricted person in violation of 18 U.S.C. § 922(g)(1).

Before the Court is Defendant's Motion to Suppress the gun found on his person.

(Docket No. 17.) The Court held an evidentiary hearing on November 18, 2003, following which the parties submitted briefing articulating their positions on the relevant law. The Court, having reviewed the parties' briefs, record, and relevant case law, issues the following Order.

## BACKGROUND

Three witnesses testified during the November 18, 2003 suppression hearing. The government called Deputy Juan M. Trujillo and Officer Dale Weese (collectively "officers"), both of whom were employed by the Ogden City Police Department at the time of Defendant's arrest. (Tr. p. 6, 23.) Defendant Simon Trujillo testified in his own behalf. (Tr. p. 31.)

The officers' testimony produced the following facts. On November 23, 2002, at approximately 2:00 a.m., Deputy Trujillo and Officer Weese were assisting gang detectives in an attempt to locate a fugitive. (Tr. p. 7, 24.) This assignment took the officers to a house located at 623 East 1225 North, Ogden, Ut., an address believed to be the residence of the fugitive. (*Id.*) Other law enforcement officers were already at the home. (*Id.* at 10.) The officers arrived at the home in separate marked cars at approximately the same time and parked directly across the street from the home. (*Id.* at 7, 24–25.) Neither Deputy Trujillo nor Officer Weese knew the physical characteristics of or other identity information about the fugitive. (*Id.* at 15, 29.) Shortly after their arrival the officers noticed a car approach the home and park on the street, in front of the home, next to the driveway. (*Id.* at 7, 25.) Defendant, the driver of the vehicle,[1] stepped out of his car, noticed the officers,

who were in full uniform, across the street and waved at Deputy Trujillo. (*Id.* at 8.)

Defendant, along with his friend, began walking up the driveway, which is approximately two-to-three-car-widths wide, to the side entrance of the home. (*Id.* at 8, 26.) Shortly thereafter, the officers crossed the street and walked up the driveway, some distance behind Defendant. (*Id.* at 9.) Defendant, his companion and the officers were the only people present outside the home. (*Id.*) Defendant approached the side door, went up a few steps, stopped on the landing and knocked on the door. (*Id.* at 9–10, 25–26.) A police officer inside the house opened the door and invited Defendant in. (*Id.* at 10.) Defendant declined, saying something to the effect of, "Nah, that's O.K." (*Id.*) Although Deputy Trujillo was on the driveway during Defendant's encounter at the side door, he was close enough to the side door to hear the entire conversation. (*Id.* at 9.)

Defendant then began his descent down the steps, presumably to return to his car. (*Id.* at 11.) As Defendant left the side door, the officer inside the house stepped onto the landing. (*Id.* at 17.) Deputy Trujillo and Officer Weese waited on the driveway during Defendant's encounter at the door. (*Id.* at 11, 26.) When Defendant reached the driveway on the way back to his car, Deputy Trujillo approached Defendant, coming within four to five feet of him. (*Id.*) Officer Weese was a few feet behind Deputy Trujillo. (*Id.*) At that point, Deputy Trujillo, wanting to satisfy his curiosity as to why Defendant did not want to go into the house, asked Defendant some questions. (*Id.* at 19.) He first asked Defendant what he was doing at the residence, to which Defendant responded that he was there to get his car.[2]

---

1. Defendant was not the sole occupant of the vehicle; Defendant's friend was a passenger.

2. Officer Weese was unable to hear the conversation between Deputy Trujillo and Defendant but he did observe the conversation. (Tr. at 27.)

(*Id.* at 12.) Officer Trujillo, consistent with his practice in similar situations, then asked Defendant if he was carrying any weapons, to which Defendant replied, "Yes." (*Id.*) Then, according to Deputy Trujillo and Officer Weese, Defendant swiftly moved his jacket to the side and reached for his hip. (*Id.* at 12–13, 27–28.) At that point Deputy Trujillo grabbed Defendant's hand, pushed it against his hip and pushed Defendant into a wall. (*Id.* at 12.) Officer Weese came to assist Deputy Trujillo and removed the firearm from Defendant's waistband, when Deputy Trujillo told him where it was. (*Id.* at 13, 28.)

Defendant's version of the events that transpired on November 23, 2002, corroborates the officers' version up to the point when Defendant began his descent down the steps. At that point, Defendant's version becomes dramatically different. Defendant testified that as he was walking down the steps he saw three to five officers pointing guns at him, including Deputy Trujillo, Officer Weese and other officers who appeared from the darkness. (*Id.* at 32–33, 37.) Defendant testified that Officer Trujillo then asked him two questions: "What are you doing here?" and "Do you have any drugs or firearms on you?" (*Id.* at 33–34.) Defendant told Officer Trujillo that he was there to pick up his car and that he did not have drugs but was carrying a firearm. (*Id.*) Defendant then leaned his hip toward the officers in an apparent attempt to indicate where he kept the gun and proceeded to unzip his coat. (*Id.* at 35.) Officer Trujillo then grabbed him and pushed him against the house. The gun was found and Defendant was arrested.

The discrepancies between Defendant's version of events and the account offered by the officers must be addressed by the Court before it proceeds to the legal issues. Having considered both the substance of the witnesses testimony and their demeanor while testifying, the Court makes the following findings of fact.

## FINDINGS OF FACT

1. On November 23, 2002, Deputy Trujillo and Officer Weese were called and reported to a home located at 623 East 1225 North, Ogden, Ut. in an effort to assist other police officers in locating a fugitive. Both officers arrived in marked police cars and wore police uniforms.

2. On November 23, 2002, Defendant arrived at 623 East 1225 North, Ogden, Ut. with a friend at about the same time the officers did. Upon arriving at the home, Defendant exited his car, waved at Deputy Trujillo and started walking up the driveway, which is two-to-three-car-widths wide, to the side door of the house. The side-door entrance to the house requires a person to walk up a few steps to a landing prior to gaining entrance.

3. Deputy Trujillo and Officer Weese, following Defendant's lead, also began walking up the driveway; Officer Weese was a few feet behind Deputy Trujillo.

4. Defendant walked up the steps to the side door and once on the landing, knocked on the door. A gang detective who was already on the scene answered the door and asked Defendant if he wanted to come in. Defendant declined, saying something to the effect of, "Nah, that's O.K." Deputy Trujillo was on the driveway when this encounter occurred and could hear everything; Officer Weese could not.

5. Defendant began walking down the steps. At this point, the gang detective who was questioning Defendant walked out onto the landing. Once Defendant was on the driveway, Deputy Trujillo approached him to ask a few questions. Deputy Trujillo stopped four to five feet from Defendant when he began speaking to Defendant. At this point in time, Offi-

cer Weese was still a few feet behind Deputy Trujillo.

6. The police officers did not draw their weapons. No police officer present at the scene pointed a weapon at Defendant.

7. Deputy Trujillo first asked Defendant what he was doing at this particular residence, to which Defendant answered that he was there to pick up his car. Deputy Trujillo then asked Defendant if he was carrying any weapons. Defendant told Deputy Trujillo that he had a gun and swiftly moved his coat to the side and reached for his hip. At that point Deputy Trujillo and Officer Weese were unsure of Defendant's intentions in pulling back his coat. The officers reasonably believed Defendant may have been reaching for a gun.

8. Deputy Trujillo grabbed Defendant's hand, pressed it against his hip and pushed Defendant against a wall in order to remove the gun. Officer Weese quickly assisted Deputy Trujillo. While Defendant was being held by Deputy Trujillo, Officer Weese removed the firearm from Defendant's waistband.

## CONCLUSIONS OF LAW

1. Deputy Trujillo and Defendant were engaged in a consensual encounter when Deputy Trujillo approached Defendant on the driveway and began asking questions.

2. Deputy Trujillo's questioning of Defendant was not done by way of physical force or show of authority that would communicate to the reasonable person that he is not free to leave.

3. Deputy Trujillo's questioning of Defendant on the driveway was reasonable in all respects.

4. The officers' actions in talking to Defendant and removing his firearm were not in violation of Defendant's Fourth Amendment rights.

## DISCUSSION

Defendant brought the instant motion to suppress the gun found by Officer Weese, arguing that Defendant was unreasonably seized by the officers in violation of the Fourth Amendment when Deputy Trujillo began questioning Defendant on the driveway.[3] (Memo ISO Motion, p. 3–6.) The government relies solely on the argument that Defendant was not seized because the encounter was consensual. (Memo ISO Opp., p. 2–5.)

### I. Legal Standard

The Tenth Circuit Court of Appeals recognizes three separate categories of police-citizen encounters: consensual encounters, investigative stops, and arrests. *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir.1992) (citations omitted). Each category of encounters has its own analytical structure; proper categorization of the encounter determines the rubric under which it will be analyzed. Consensual encounters are not considered seizures and do not implicate the Fourth Amendment. *Id.* (citation omitted). An investigative stop is a "brief, nonintrusive detention during preliminary questioning or a frisk for weapons" that is a seizure but is justified for Fourth Amendment purposes by an officer's articulation of reasonable suspicion

---

**3.** Defendant does not contend that the officers violated the Fourth Amendment when they physically restrained Defendant and removed the gun. Even if Defendant had made that argument, the Court's ultimate conclusion would be the same because at that point in the encounter, the officers had a reasonable articulable suspicion that Defendant was en-

gaging in criminal activity, i.e. reaching for a concealed weapon, presumably to use it against the officers, who, as a result, justifiably seized Defendant without violating the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**1168**

that criminal activity is afoot. *Id.* (citation omitted). Finally, arrests are detentions that must be supported by probable cause to be valid. *Id.* (citation omitted).

■ It is unlikely that a single bright-line test could account for all the myriad situation in which citizens encounter law-enforcement officers. The Tenth Circuit Court of Appeals has, however, delineated relevant factors to help courts determine when an encounter between a police officer and a citizen is a seizure under the Fourth Amendment. Generally, whether questioning of a citizen by a police officer is a seizure or a consensual encounter depends on whether the officer "by means of physical force or show of authority ... in some way restrain[s] the liberty of a citizen," communicating to the reasonable innocent person that he is not free to leave. *United States v. Sanchez,* 89 F.3d 715, 717–18 (10th Cir.1996) (quoting *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Laboy,* 979 F.2d 795, 798 (10th Cir.1992)).

■ Before addressing these factors in detail it is useful to dispose of one aspect of the encounter before this Court which the United States Supreme Court has determined not to be a seizure: mere questioning. "Police questioning, by itself, is unlikely to result in a Fourth Amendment violation," *I.N.S. v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and that "a seizure does not occur simply because a police officer approaches an indi-

vidual and asks a few questions." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Deputy Trujillo's decision to talk to Defendant is insufficient, without more, to constitute a seizure.

■ The Tenth Circuit Court of Appeals has articulated a number of factors district courts are to consider in determining whether a police-citizen encounter was sufficiently coercive that a reasonable person would believe he was not free to end the encounter.[4] These factors include, but are not limited to: (1) the number of officers present, (2) whether the officers had their weapons drawn, (3) physical touching by an officer, (4) language used aggressively or in a tone by an officer that indicates compliance is compulsory, (5) a request to accompany the officer to the station, (6) whether the encounter occurred in public view, (7) whether officers are uniformed or in plain clothes, and (8) whether defendant was specifically advised that he had the right to terminate the encounter or refuse to consent. *United States v. Sanchez,* 89 F.3d 715, 718 (10th Cir.1996) (citation omitted); *United States v. Zapata,* 997 F.2d 751, 756 (10th Cir.1993) (citations omitted); *United States v. Laboy,* 979 F.2d 795, 798–99 (10th Cir.1992) (citations omitted). Determining whether a seizure occurred during a police-citizen encounter is a fact-specific inquiry, to which no one fact is determinative, and therefore requires a court to

4. Defendant appears to argue that Deputy Trujillo's reason for initiating the questioning of Defendant is relevant to the Court's inquiry. Deputy Trujillo, admittedly, began questioning Defendant to satisfy his curiosity as to why Defendant was at the house. However, Deputy Trujillo's purpose behind questioning Defendant is irrelevant to the Court's inquiry. The Tenth Circuit has held that an officer may approach a citizen and ask questions based solely on a hunch, *United States v. Lambert,* 46 F.3d 1064, 1067 (10th Cir.1995) (citation

omitted), and those questions can include an inquiry into the presence of weapons, *United States v. Turner,* 928 F.2d 956, 958 (10th Cir.1991) (quoting *United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990)); *see also United States v. Gerby,* 41 Fed.Appx. 312 (10th Cir.2002) (finding the officer's question regarding the defendant's possession of guns or drugs was consensual because the officer's question was "unaccompanied by any show of authority or coercion").

decide from the totality of the circumstances whether a defendant has been seized. *United States v. Little,* 18 F.3d 1499, 1504 (10th Cir.1994). Such a test is necessarily imprecise, but the focus is on "the coercive effect of police conduct taken as a whole" on a reasonable person. *Michigan v. Chesternut,* 486 U.S. 567, 573–74, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

The Tenth Circuit has recently decided several cases with facts sufficiently similar to the present case to be helpful to the Court in analyzing the encounter between Deputy Trujillo and Defendant. In *United States v. Zapata,* 997 F.2d 751 (10th Cir. 1993), defendant was aboard a train going from Los Angeles to Chicago. 997 F.2d at 753. While the train made a brief stop in Albuquerque, New Mexico, an undercover, but armed, DEA enforcement agent boarded the train with an Albuquerque police department detective[5] in an effort to locate drugs. *Id.* The agent singled out defendant, approached him from behind and eventually stopped directly in front of him, blocking his means of egress.[6] *Id.* at 753–54. The agent turned on a tape recorder, which was hidden in a fanny pack, showed the defendant his badge, obtained his ticket and began asking questions about the contents of his luggage. *Id.* at 754. During the entirety of this conversation the defendant was seated next to his common-law wife and child. *Id.* at 753. The conversation eventually led to a search of Defendant's bag where several kilograms of cocaine were found. *Id.* The defendant moved to suppress the cocaine, alleging the encounter was a seizure in violation of the Fourth Amendment, which the district court granted. The Tenth Circuit reversed the district court's decision.

*Id.* at 756. After discussing the parameters of the law and listing the factors mentioned above, the court found that "virtually all those factors indicate a consensual encounter" reasoning that "[a] reasonable person in [the defendant's] position would have felt free to decline to answer the agent's questions or otherwise terminate the encounter." *Id.* at 757–58.

In *United States v. Sanchez,* 89 F.3d 715 (10th Cir.1996), an armed officer, who was accompanied by a university security aid, noticed, in a university parking lot at 9:30 p.m., two individuals, of which defendant was one, who appeared to be walking toward some campus dorms. 89 F.3d at 717. The officer called the men over to his car to find out if they were students, but the two individuals did not respond. *Id.* The officer exited his vehicle and again called to the individuals, both of whom then turned around and walked back toward the officer. *Id.* The officer asked for identification, which neither could produce. *Id.* The officer asked the defendant if he had identification in his car. *Id.* The defendant indicated that he might, turned away from the officer, walked back to his car and began rummaging through his car. *Id.* The officer, becoming concerned for his safety because he had not searched the defendant for weapons and was not wearing a bullet-proof vest asked for permission to search the defendant's car for weapons. *Id.* The defendant agreed and the officer found 500 grams of cocaine in the car. *Id.* The officer did not inform the defendant of his right not to answer the questions. *Id.* at 718. Defendant moved to have the cocaine suppressed, arguing that he was seized when the officer engaged him in conversation. The Tenth Circuit held the encounter to be consensu-

---

**5.** The decision is silent as to whether the police detective was uniformed.

**6.** The district court found, as a matter of fact, that the agent blocked the defendant's egress while he asked him questions, *Zapata,* 997 F.2d at 754; the Tenth Circuit did not address this factual finding, and gave no indication that the finding was clearly erroneous.

al and affirmed the district court's denial of the motion. *Id.* After listing the factors mentioned above, the court found that "none of [the] factors [were] present," *id.* at 718, and concluded that "[o]n these facts, a reasonable innocent person would have felt free to terminate the encounter and leave the scene," *id.* (citation omitted).

In *United States v. Hill*, 199 F.3d 1143 (10th Cir.1999), the Tenth Circuit was called upon to decide whether an officer's questioning of defendant on a bus was a seizure implicating the Fourth Amendment. 199 F.3d at 1145–47. The defendant in *Hill* was aboard a bus that stopped in Gallup, New Mexico. *Id.* at 1145. A deputy, wearing a badge and a holstered sidearm, boarded the bus and announced that he would be inspecting the bus for narcotics and wanted the passengers to identify their carry-on baggage. *Id.* at 1145–46. The deputy proceeded down the three-and-one-half-foot wide aisle to the rear of the bus and began questioning the bus passengers, positioning himself parallel to the seat back of each passenger's seat. *Id.* at 1146. He arrived at the defendant's row. *Id.* After some questioning of defendant, without notification to defendant that he did not have to answer the questions, and a subsequent search, the deputy found bottles containing PCP. *Id.* at 1146–47. After the district court denied his motion to suppress the bottles, the Tenth Circuit affirmed the district court's ruling, holding the encounter between the defendant and the deputy was consensual and not a seizure. *Id.* at 1149.

The court reasoned that based on the totality of the circumstances "a reasonable person would have felt free to terminate the encounter." *Id.* at 1150.

## II. Analysis

■ Consistent with the Tenth Circuit precedent discussed above, the Court concludes that Deputy Trujillo's conversation with Defendant was consensual in nature and did not constitute a seizure. Deputy Trujillo, with Officer Weese a few feet behind, was four to five feet away from Defendant when he asked him two questions. This brief encounter occurred on a private driveway only a few feet away from a public street in a residential neighborhood. Considering the factors stated in *Sanchez, Zapata* and *Laboy,* the actions taken by Deputy Trujillo and Officer Weese were not coercive individually or taken as a whole. The test the Court must employ in determining whether the encounter was consensual or a seizure is not whether Defendant felt free to leave, but whether the reasonable person would; it is an objective, not a subjective test.

Nothing in this case leads the Court to believe that Deputy Trujillo's questioning of Defendant was coercive. Deputy Trujillo, Officer Weese and the other officer did not physically touch Defendant; Deputy Trujillo was closest in physical proximity to Defendant but was still four to five feet away. The officers did not position themselves in a manner that would have made the reasonable person feel that he was physically trapped or could not leave.[7] No

---

7. At the time of the questioning, three officers were present. The number of officers is pertinent because the physical location of law enforcement officers can demonstrate to the reasonable person that he is not free to leave or otherwise terminate the encounter; i.e., surrounding the defendant may be coercive. However, after considering the presence of the officers and their location, the Court is unable to find even a modicum of coercion

presented. When Defendant declined to enter the home and attempted to leave, the officer who answered the door stepped out of the house onto the landing and was therefore behind Defendant. At the same time Deputy Trujillo and Officer Weese were standing on the driveway in a staggered position between Defendant and his car. At no time prior to being made aware of Defendant's gun did any officer come within more than four to five feet

officer had his weapon drawn. See *United States v. Gerby*, 41 Fed.Appx. 312, 314 (10th Cir.2002) (holding that police-citizen encounter was consensual because the officer showed no signs of coercion in large part because the officer's weapon was holstered). Deputy Trujillo did not ask his questions in an aggressive or intimidating manner.[8] The encounter occurred in public view.[9] Deputy Trujillo did not ask Defendant to accompany him to the police station. Deputy Trujillo did not obtain or retain any of Defendant's belongings. The fact that the officers were uniformed and that Deputy Trujillo did not advise Defendant that he had the right to leave does not render this encounter a seizure.

Deputy Trujillo and Officer Weese were uniformed on November 23, 2002. The presence of a uniformed officer brings a weight of authority to every police-citizen encounter. Based on the facts of this case, however, Defendant did not present evidence to the Court explaining how the officers' uniforms, or their badges, made the encounter coercive. In light of the little weight the Tenth Circuit gave to the presence of the deputy's badge in *Hill*, the Court is not persuaded that the fact that Deputy Trujillo was uniformed is sufficient to demonstrate coercion.

■ Defendant was not advised of his right to terminate the encounter by any officer present. The United States Supreme Court, in *I.N.S. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), recognized that "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." 466 U.S. at 216, 104 S.Ct. 1758 (citation omitted). Although Deputy Trujillo failed to inform Defendant of his right to leave, such a warning was not necessary. *See United States v. Laboy*,

of Defendant. The Court finds this distance, under the circumstances, to be sufficient to demonstrate to the reasonable innocent person that he is not being cornered or surrounded by the officers, in a manner that would prevent him from ending the encounter by walking away.

Instructive in this regard are the facts in *United States v. Hill*, 199 F.3d 1143 (10th Cir.1999). As discussed more fully above, the Tenth Circuit, in *Hill*, found that a deputy who boarded a bus to ask questions of the passengers did not hinder the defendant's ability to exit the bus because the deputy, when questioning the defendant, stood in the aisle of the bus at the rear of defendant's seat. *Id.* at 1148. Unlike the defendant in *Hill*, who had only one means of egress requiring him, at a minimum, to brush shoulders with the deputy as he attempted to exit the bus, Defendant, because Deputy Trujillo was standing four to five feet from Defendant, had at least as good an opportunity of terminating the encounter by walking around Deputy Trujillo.

8. To the extent inquired into at the evidentiary hearing, the conversation was more friendly than coercive. Defendant did not provide any testimony to the Court that Deputy Trujillo told him to freeze or otherwise used language in a coercive manner. There was nothing inherent in the questions posed that would cause the reasonable innocent person to feel intimidated or to believe that answering the questions was unavoidable. Deputy Trujillo merely asked Defendant his reason for being at the premises and whether he was armed. *See United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990) (finding that an officer may approach a citizen and ask questions that include inquiries into the presence of weapons.)

9. Deputy Trujillo's encounter with Defendant occurred on private property, outdoors on a driveway of a house, only a few feet from a public road. It was 2:00 a.m., with presumably little, if any, traffic. But there was nothing about the entire scene that suggested coercion. Furthermore, as was the case in *Sanchez*, Defendant was accompanied by his friend during the encounter, therefore at least one other member of the public was there when the encounter began.

979 F.2d 795, 799 (10th Cir.1992) ("Although [the detective] never explicitly told [the defendant] he did not have to cooperate, *such advice was unnecessary.*") (emphasis added); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

When viewing the totality of the circumstances present in this case, in the light of Tenth Circuit precedent, this is not a case where the circumstances are "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." *Id.* The scene was devoid of the coercion and intimidation necessary to turn this brief consensual encounter into a seizure.

For the Court to rule the encounter a seizure would be to ignore clearly established Tenth Circuit precedent. It would be hard to say that the reasonable person under the facts of *Zapata, Sanchez* and *Hill* were free to leave, but find that the reasonable person, in Defendant's position, under these facts, was not free to leave. The facts of this case are devoid of coercion and therefore the reasonable person, under the circumstances, would have felt free to leave. Accordingly, the Court FINDS that Defendant was not seized and Deputy Trujillo's questioning of Defendant does not implicate the Fourth Amendment.

### CONCLUSION

For the above-stated reasons, the Court DENIES Defendant's Motion to Suppress.

IT IS SO ORDERED.